(Nos. 41796, 41863 cons.—

WEILAND TOOL & MANUFACTURING Co., Appellant, *vs.* EMERSON C. WHITNEY *et al.,* Appellees.

*Opinion filed Sept. 26, 1969.—Rehearing denied Jan. 26, 1970.*

MORTIMER, NOLAN, O'MALLEY & DUNNE, (ROBERT J. NOLAN, GERALD M. CHAPMAN, and EDWARD J. HLADIS, of counsel,) for appellant.

EMERSON C. WHITNEY, of Chicago, (JOHN D. DEMPSEY, of counsel,) for appellees.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This case has a long and complicated history. In August, 1956, Weiland Tool and Manufacturing Co. filed a complaint to foreclose a common-law lien upon certain machinery and property of Emerson C. Whitney in the possession of Weiland. Whitney filed an answer and a counterclaim by which he claimed damages for fraud in inducing him to enter into a contract, breach of the contract, and conversion of the property. The circuit court of Cook County entered a decree in favor of Weiland for $12,661.62 plus additional amounts for loading and moving expenses and other items. Upon appeal the Appellate Court, First District, reversed and remanded for disposition of the counterclaim. (40 Ill. App.2d 70.) A petition for leave to appeal to this court was dismissed (26 Ill.2d 628), upon Whitney's motion because of

non-finality under then section 75(2)(C) of the Practice Act. (Ill. Rev. Stat. 1963, ch. 110, par. 75.) Upon remand, the trial court entered judgment for Whitney for a total of $19,935. The Appellate Court affirmed, with modifications. (100 Ill. App. 2d 116.) We granted leave to appeal.

While the facts are adequately set forth in the original Appellate Court opinion as supplemented in its second opinion, we think it advisable for a better understanding of the lengthy and complicated facts and actions of the several courts to outline the facts and holdings in this opinion.

In June of 1954, Weiland was operating a job manufacturing plant in Chicago. Vincent P. Weiland was the owner and represented that company in all matters material to this case. Whitney owned unassembled machinery and dies for making a product called Hexarmour, a fabricated steel product made of mats 4 feet by 10 feet, which, joined together, are used to reinforce concrete floors. It is made up of cells several inches in diameter, approximately an inch in depth and hexagonal in shape.

Whitney, although a lawyer, had been active in the manufacture of steel products. He planned to market Hexarmour, but he wanted it made by another manufacturer on equipment he, Whitney, owned. He had made such an arrangement with Carl Carlson of Batavia and had delivered his equipment and 300,000 pounds of steel to Carlson. Whitney and Carlson disagreed as to the production capabilities of the machinery and their arrangement was abandoned. Whitney then sought another manufacturer. Through an advertisement and after an initial meeting between Weiland and an employee of Whitney, Whitney and Weiland met on June 29, 1954, to discuss an arrangement under which Weiland's company would manufacture and Whitney would sell Hexarmour. Whitney's steel and his machinery, disassembled and partly in barrels, was in Carlson's plant at that time. This discussion of June 29 and several letters which followed it resulted in such an arrangement.

Immediately following the meeting, Whitney went to Florida, Weiland looked at the machinery and the steel at Carlson's plant, and several letters were exchanged. After the conclusion of this correspondence, on July 14, 1954, Weiland moved Whitney's steel and equipment to its own plant. Weiland found that it could not manufacture in satisfactory quantities with the equipment and could not manufacture at all the product Whitney contends he was required to produce. Whitney claimed the ends of Hexarmour mats were to be straight so that they could be used interchangeably with a similar product, Hexsteel. The Hexarmour mats which could be produced on Whitney's equipment were joined by prongs designed to fit into holes on a companion mat. Whitney claims, in effect, Weiland should have altered the equipment to produce straight edged Hexarmour. Apparently due to this controversy over product design and the fact that Whitney produced no orders the project failed, but not until each party had incurred expense in connection with it. Each accuses the other of breaching the agreement between them.

The parties disagree upon the terms of the agreement and the evidence which may properly be considered in proving and interpreting the agreement. Weiland contends that Whitney represented and warranted his equipment would produce Hexarmour to Whitney's requirements, and that the agreement consists of an oral understanding reached at the June 29th meeting and the four letters that followed it. Whitney contends that the agreement is in writing, is evidenced by only three of the letters, is unambiguous and that extrinsic evidence may not be considered. He urges that this written agreement obligated Weiland to accept the machinery on an "as is" basis and at its own cost to cause it to produce Hexarmour to Whitney's specifications in quantity production.

The evidence relating to what occurred at the meeting of June 29th, as well as to other material matters, is in con-

flict. The entire project was, of course, discussed at this meeting and after consideration of the record, including the master's report, we are satisfied that Whitney gave definite assurance to Weiland that his equipment, when assembled and with power applied, would produce Hexarmour of the kind Whitney wanted. Although Weiland had viewed the machinery and steel in Carlson's plant prior to the exchange of letters, the condition of the machinery in its disassembled state was such that an inspection at that time would not have disclosed its capacity to produce. After Whitney and Weiland met, they exchanged four letters. The material portions of the first two of these letters read:

### Weiland to Whitney, July 2, 1954.

"Weiland will fabricate mats *as required by you, using your special hydraulic clinching unit and your Rockford Press,* also your dies. * * * You, at your own expense, will move the machinery and steel from Batavia to our plant and set up same for production, including electrical wiring. * * * Apparently some work has to be done on your die, to which we would assign our skilled toolmakers again under Mr. Bedner's instructions.

\* \* \*

"Therefore we could come to terms by quoting a cost plus basis using twenty cents as a floor and twenty-four cents [per square foot] as a ceiling. Or if acceptable to you we could go along on a flat twenty-two cent price until more experience can be gained, at which time we could then renegotiate the price.

\* \* \*

"It is also understood that you are to furnish all steel for this product and that we are to store same." (Emphasis added.)

### Whitney to Weiland, July 9, 1954.

"I am quite willing to pay 22¢ squ. ft. for making the hexarmour * * *. However, there are a number of items which properly should and will have to be done by your good company in order to install and start production for Hexarmour. First of all, it will be necessary for your company to load machinery and steel and to unload it and put the machinery together and install it in your plant.

\* \* \*

"You, of course, will be asked to maintain, repair and keep up

all tools, dies and other equipment, and to sharpen and replace punches as required.

\* \* \*

"I understand that the hexarmour die is now properly broken in and makes a good sample piece of Hexarmour with the possible exception of repositioning the gauge. However, I am not a tool and die man, and I cannot guarantee that this is so, I can only tell you that the last sample pieces run off by Carlson looked fine to me. You will have to examine the die, and if any *adjustments* are necessary on it, I will expect you to make them, as you will have to continue to make them throughout the time that the die is used. *Any die that is run continuously with automatic feed is subject to adjustments from time to time.*

\* \* \*

"I gave a completed sample of the hexarmour, as well as the blue prints of the finished produce [*sic*] and of the completed hexarmour clinching table to Carlson and you should regain it then from him.

\* \* \*

"The most important thing is that the die and the clinching table *will* be able to make the hexarmour in accordance with the sample.

\* \* \*

"\* \* \* and we undertake all expenses in connection with the sale of this article.

\* \* \*

"At the previous plant where I made similar material *we ran four presses and two Hexarmour clinching tables three shifts a day,* six days a week and we still did not keep up with our orders." (Emphasis added.)

After Whitney's letter of July 9th, the parties discussed on the telephone the sharing of cost of certain of the equipment and the steel moving costs. Then by letter dated July 14, Weiland indicated that the terms of the July 9th letter were acceptable subject to the sharing of the moving costs of the press and clinching tables. By letter of the same date (July 14) Whitney indicated his approval of the sharing of the moving costs of the machinery. These letters apparently crossed in the mails.

Weiland discovered substantial deficiencies in the machinery, and when these were called to the attention of Whitney he authorized Weiland to correct them at his,

Whitney's, expense. In addition, Whitney agreed by letter and without objection to pay for specific items of this expense. At the trial he explained this by testifying that he was acting under economic duress, but, in our opinion, his proof of such duress was unconvincing.

Weiland's complaint alleged among other things that the agreement in question consisted of all four of the letters exchanged and the assurance given in the June 29th conference that pursuant to the agreement Whitney assured Weiland all that need be done to his machinery to enable it to produce Hexarmour to his specifications was to assemble it and apply electric power to it, that it would not so perform, and that Weiland, at the request of Whitney, spent approximately $12,661.62 attempting to correct the machinery. This amount Weiland claimed as damages, together with $8,264.74 for other expenses incurred in connection with the project, $125 for loading, unloading and freight costs on machinery, $7,000 for storage of the machinery and steel after the project terminated, and $40,000 for profits on business it might have undertaken had its plant capacity and energies not been taken up by the Hexarmour project.

Weiland claimed a lien on the machinery and steel for these damages. Under claim of lien it held the machinery until January 10, 1964, when it was returned to Whitney, and he held the steel until it was sold during the litigation pursuant to stipulation for a net amount of $11,265.36, this amount being deposited with and presently held by the clerk of the court.

Whitney answered denying that he breached the contract and filed a counterclaim alleging that it was Weiland who in fact failed to perform and charging fraud and deceit. He asked substantial damages against Weiland, including $115,000 for conversion of his machinery and steel as a result of Weiland's refusal to deliver these items upon request.

The trial court referred the case to a master, who found

the issues generally in favor of Weiland, recommending that Weiland recover $12,661.62, its costs of correcting equipment and dies, together with amounts for storage of the equipment during the period after termination of the contract, for its share of the moving costs of the machinery and steel, and for the contract price of 72 mats of Hex-armour delivered. The master believed the estimated profits for other business lost were too remotely connected with Whitney's breach to be allowed as damages. The trial court followed the master's recommendations and entered a decree November 16, 1959. Upon appeal the Appellate Court held that the entire contract was in writing as Whitney alleged, that its meaning was unambiguous, and that the language used clearly indicated an intention that Weiland accept Whitney's equipment on an "as is" basis. Following remandment, the circuit court entered judgment for $19,955 on the counterclaim. The Appellate Court, refused, upon appeal from this judgment, to reconsider its decision on the first appeal, and affirmed the judgment in favor of Whitney with certain modifications. Weiland filed a petition for leave to appeal to this court and Whitney cross-appealed on the theory that damages awarded him by the judgment of the circuit court, as modified, were inadequate.

Whitney contends the disposition of the first appeal by the Appellate Court is *res judicata* of the allegations of Weiland's complaint since Weiland's attempt to appeal that decision to this court was unsuccessful. The petition for leave to appeal to this court was not denied but was dismissed on Whitney's motion that the judgment appealed from lacked finality. Dismissal was a determination only that this court lacked jurisdiction to entertain the appeal at that time. A dismissal of a cause for lack of jurisdiction does not constitute an adjudication of the substantive issues involved. (*City of Geneseo* v. *Illinois Northern Utilities Co.*, 378 Ill. 506.) The first judgment of the Appellate Court may have been the "law of the case" for that court, but that

does not apply to us. This is the first time the cause has been before us on the merits and our review must necessarily cover all matters properly raised and passed upon in the course of this litigation.

Whitney contends that Weiland's letter to him of July 2 is not a part of their agreement, that the entire agreement is contained in his, Whitney's, letter of July 9, and the letters of July 14, and that these are clear and unambiguous in providing that Weiland accepted the machinery on an "as is" basis. He contends, therefore, that Weiland's letter of July 2, and evidence of what transpired at the meeting of June 29 may not be considered. He cites cases such as *Gould* v. *Magnolia Metal Co.*, 207 Ill. 172. The so-called parol-evidence rule is, in fact, a rule of contract construction as well as an evidence rule. If the parties to an instrument intend that it alone is to constitute the agreement between them or if the instrument itself is complete and discloses no intention that extrinsic matters are a part of it, terms not included in the instrument may not be proved; and if its language is unequivocal, no evidence to show any other meaning or intention may be considered. (*Armstrong Paint and Varnish Works* v. *Continental Can Co.*, 301 Ill. 102, 106.) It follows, however, that if the agreement is not complete or if the language of the instrument is ambiguous or uncertain, then in either event extrinsic evidence may be introduced to expand or interpret the document, as the case may be. We believe that the letters of July 9 and July 14, due to their informal nature seem not to be complete and must be construed together with and in the light of the letter of July 2 and of the assurances given at the June 29 meeting. Regardless, however, of the view taken as to the completeness of the letters of July 9 and July 14, the meaning, in important respects, of Whitney's letter of July 9 is unclear and equivocal and therefore the totality of the transactions, including what transpired at the meeting of June 29 and Weiland's letter of July 2, on that basis alone

may properly be considered to interpret the meaning of specific words and phrases of the letters exchanged between the parties. See *Chicago Auditorium Ass'n* v. *Corporation of Fine Arts Building,* 244 Ill. 532, 539; *Koelmel* v. *Kaelin,* 374 Ill. 204, 210; *Martindell* v. *Lake Shore National Bank,* 15 Ill.2d 272, 283.

In Whitney's letter of July 9 he required Weiland to maintain the machinery and return it in good condition less normal wear. He said that the die was properly broken in and made a good sample with the possible exception of re-positioning of the gauges. Whitney then said "I cannot guarantee that this is so, I can only tell you that the last sample pieces run off by Carlson looked fine to me." That this elimination of guarantee relates only to limited deficiencies in the die is clearly indicated in the sentences that immediately follow the latter quotation: "You will have to examine the die and if any *adjustments* are necessary on it, I will expect you to make them, as you will have to continue to make them throughout the time that the die is used. Any die that is run continuously with automatic feed, is subject to *adjustments* from time to time." (Emphasis added.) Thus, Whitney was referring here only to "adjustments" as distinguished from repairs and alterations. Even the "adjustments" he was referring to were limited to the type required in a die run continuously with automatic feed. It is significant, also, that the language relating to absence of guaranty and limited adjustments applied only to the die and not to other parts of the equipment. All Whitney expressed in this language was the responsibility of Weiland for die adjustments of the type required in any die run continuously. The difficulties with the machinery were far more serious than mere die adjustments. The letter of July 9 did not impose upon Weiland the obligation at its own expense to make the machinery produce the Hexarmour Whitney required regardless of its capabilities at the time Weiland received it. On the contrary, it seems to indicate

that Whitney either intended to take that responsibility, or expressed himself in such a way that Weiland could reasonably believe that he so intended. "The most important thing" said Whitney in his letter "is that the die and the clinching table will be able to make the hexarmour in accordance with the sample." While the use of the verb "will be" may have kaleidoscopic aspects, we conclude that as used it has its simple future meaning only. Whitney continued: "At the previous plant where I made similar material, we ran four presses and two hexarmour clinching tables three shifts a day, six days a week and we still did not keep up with our orders", implying of course that his machinery when so assembled was capable of such operation.

In interpreting the letter of July 9 we have taken into consideration not only that inferences from ambiguous language must be resolved against its author, Whitney, but also that he is a lawyer with a number of years trial experience and experience as a legal adviser in commercial transactions. He must have had the ability to express in concise and clear English that Weiland must make the equipment work and that he, Whitney, would have no responsibility in that respect, if that were his intention. Since he did not do so, we are further persuaded that this was not his intention.

Interpreted most favorably to Whitney, the letter of July 9 is at least ambiguous, and the letter of July 2 of Weiland's and the conversation of June 29 therefore may be considered. These we believe only confirm the foregoing interpretation. In the meeting of June 29 the record indicates that Whitney assured Weiland that the equipment needed only assembling and the application of power to produce what Whitney wanted. The opening letter of July 2, Weiland to Whitney, stated that Weiland would fabricate mats "as required by you, using your special hydraulic

clinching unit and your Rockford Press, also your dies." This seems to negate any intention that Weiland must alter or repair the equipment to produce the Hexarmour mats. The letter of July 9, Whitney to Weiland, does not contradict or reject this implication.

We hold that Whitney failed in his obligation to deliver equipment which when assembled would produce Hexarmour to Whitney's specifications; and he failed to carry out his promises to reimburse Weiland for amounts expended by Weiland in an effort to make it produce.

The evidence indicates and the trial court found in its first decree that Weiland expended $12,661.62 for labor and material in completing and altering the machinery and that it is entitled to reimbursement for this amount, and for $125, the one-half share of Whitney of the loading and moving expenses, and for $475.20, the contract price of mats completed and tendered to Whitney. In this, the first decree of the trial court should be affirmed.

The trial court correctly denied Weiland's recovery for profits it might have made had its plant capacity and effort of its employees been devoted to pursuits other than the Hexarmour project. If Weiland could have proved with sufficient definiteness the profits it might have made from the Hexarmour venture, the loss of those profits (although we do not now so decide) might have been made the basis of recovery. Weiland did not attempt to prove such profits; no doubt, because such proof would have been difficult. Whitney did not agree that orders would come in any particular quantity or rate. Thus Weiland's unit costs would be difficult if not impossible to determine. It is possible that Whitney might have complied with all his obligations, delivered adequate machinery and exercised reasonable efforts to sell the product, and still not have produced enough orders for Weiland to make a profit or a profit as great as might be made from other business. To allow as damages anticipated

profits from its other business might result in greater profits than, under certain circumstances, Weiland would have made from the Hexarmour venture had Whitney carried out all his obligations. Therefore, damages based on profits from such other business are too remotely connected with Whitney's breach and too speculative to be considered.

Weiland was a bailee of all the machinery and steel delivered under the Hexarmour agreement. The Hexarmour machinery was improved by Weiland with the approval of Whitney while it was in its possession as bailee, and Weiland is entitled to a lien not only upon the Hexarmour equipment but upon the steel and other machinery delivered to it under the Hexarmour contract, including certain bridge fabricating equipment delivered to Weiland and which under the arrangement Weiland was to store free of charge. See *Knapp Stout & Co. v. McCaffrey*, 178 Ill. 107, 112; Annotation 25 A.L.R. 1037; *Buckler Co. v. American Metallic Co.*, 214 Oregon 639, 332 Pac. 614, 618.

We are of the opinion that the trial court was in error in determining that Weiland was entitled to compensation for storing the machinery and steel. Whitney had demanded its return and Weiland was holding it to protect its lien. Under such circumstances Weiland's storing of it was for its own purposes and not for Whitney's benefit. See *Johnson v. Throop Street Auto & Wagon Co.*, 232 Ill. App. 513, 515.

The clerk of the circuit court should be directed to disburse to Weiland the deposit of $11,256.36 held as the proceeds of the sale in 1959 of the steel involved in this cause, and this amount shall be credited against the amounts owing to Weiland pursuant to the final disposition of this cause. The master's fee of $5,000, together with other amounts assessed at the conclusion of the original trial of the case, are assessed against Whitney.

The judgments of the Appellate Court in both appeals are reversed and the judgment of the circuit court of Cook

County of November 16, 1959, is affirmed in part and reversed in part, and the cause is remanded to that court for judgment consistent with this opinion.

*Appellate Court reversed; circuit court affirmed in part and reversed in part; cause remanded with directions.*