PAUL JOSEPH, Plaintiff-Appellee, *v.* LAWRENCE WILSON *et al.*, Defendants-Appellants.

First District (5th Division)    No. 77-378

Opinion filed February 3, 1978.

Alan L. Unikel, of Chicago (Rosenberg, Savner & Unikel, of counsel), for appellants.

Robert D. Allison and Arthur T. Susman, both of Prins, Flamm & Susman, Ltd., of Chicago, for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

This action was brought by plaintiff, Paul Joseph, a former employee of Wilson Leasing Company, to recover damages for breach of contract to purchase stock in the corporation from defendants, majority shareholders therein. After a trial by jury a verdict was returned in favor of plaintiff against all three defendants and damages were assessed at $30,000. Special interrogatories found that there was a valid contract and that it was not barred by the statute of frauds. Judgment was entered on the verdict.

Defendants appeal. The issues are: (1) whether the agreement constituted a contract of sale or an option to purchase contingent upon plaintiff's concurrent employment; (2) whether the damages awarded are excessive; and (3) whether all three defendants are bound by the agreement.

In 1967, Wilson Leasing Company, an automobile and equipment leasing concern, was a family-owned business. All the stock in the

corporation was held by defendants, three members of the Wilson family. Defendant Milton Wilson was chairman of the board of directors, treasurer and secretary. Milton's son, defendant Lawrence Wilson, was president and chief executive officer. The third shareholder, Sylvia Wilson, Lawrence's mother, was never involved in the management of the company.

Lawrence Wilson hired plaintiff, Paul Joseph, as leasing manager of the company in 1967. During the employment negotiations plaintiff and Lawrence Wilson discussed the opportunity plaintiff would have to share in the company's growth. In 1968, plans were developed to sell stock in Wilson Leasing to the general public. Plaintiff and Lawrence Wilson discussed the likely capital structure of the company after going public, the class of stock available to employees as stock options and its price.

One class of common stock, Class A, was to be offered to the public. The Wilson family held Class B stock acquired at "base cost" convertible to Class A shares under a formula applicable if the company reached a certain profit level. It was contemplated that Class B stock would be available to certain employees, including plaintiff, at the same price paid by the Wilson family. Plaintiff testified that while the public offering was being arranged in 1968, Lawrence Wilson told him that he would receive 10,000 shares of Class B stock at the same cost as the Wilson family. The Wilson Company stock was offered to the public on February 5, 1969.

On March 21, 1969, Lawrence Wilson indicated that plaintiff would receive 2000 or 4000 shares of stock. Plaintiff testified that he then quit his employment since the amount was less than the 10,000 shares which had originally been promised to him. Plaintiff further testified that Lawrence Wilson telephoned him at home and asked if he would reconsider and return to work if he received 10,000 shares. Plaintiff agreed. On March 24, Lawrence Wilson drafted a memorandum to Ted Gaines, the Wilson's attorney, concerning the transfer of 10,000 shares to plaintiff. The memorandum, which the parties agree contains the basic provisions of their oral agreement reached on March 24, is set forth as follows:

3/24/69

"To: Ted Gaines                    Subject: Paul Joseph stock
    Please arrange an immediate transfer of 2000 of my shares plus 1000 each from my parents.
    Also draft an agreement to allow P.J. to buy 2000 add'l shares on 9/30/70-9/30/71 & 9/30/72. At 9/30/72 he'll have 10,000 shares of B convertible to 11,000 A—all bought at our base cost.
                                            L.S.W."

Although the March 24 agreement called for the immediate transfer of 4000 shares, certificates for the 4000 shares were not delivered to plaintiff until November 7, 1969. Plaintiff paid for the shares upon delivery with a

$400 check payable to Lawrence Wilson and a $400 check payable to Milton Wilson, being at a rate of 20¢ per share for a total payment of $800.

Although plaintiff had begun employment in 1967 as manager of the automobile leasing division, he had been promoted to vice president of the division in 1968. When the Wilson Company acquired an automobile agency in 1969, plaintiff was made executive vice president of the dealership. Plaintiff worked for the Wilson Company until he was asked to resign in May 1972. No stock other than the initial 4000 Class B shares has been transferred to him.

In the meantime certain business interests proved unprofitable for the Wilson Company, and the value of its Class A stock began to decline. Finally in 1975, Wilson Leasing "went private" in a transaction wherein outstanding Class A stock was exchanged for a note worth $2.50 per share. At that time the book value of its assets was approximately $5 per common share.

## I.

There is no dispute that an agreement existed between the parties for the transfer of 10,000 shares of stock. The parties agree that the written memorandum set forth above evidences the basic agreement so as not to be barred by the statute of fraud. However, it is apparent that this writing was not meant to be a final manifestation of their intent concerning the transfer. To the extent that a written instrument is not complete or that its language is ambiguous, we may look to extrinsic evidence to interpret the document. *Weiland Tool & Manufacturing Co. v. Whitney* (1969), 44 Ill. 2d 105, 251 N.E.2d 242.

Essentially, the parties do not agree upon the nature of the contract. Defendants characterize the agreement as an option contract, whereas plaintiff urges that the agreement constitutes a contract of sale. Specifically, defendants argue that the agreement constitutes a present right to purchase 4000 shares of stock and a future right to purchase 6000 shares. They urge that the future right was contingent upon plaintiff's employment at the Wilson Company on the dates specified, and that the option was given as an incentive for plaintiff to remain in the employ of the Wilson Company. On the other hand, plaintiff contends that the agreement manifests a present right to purchase 10,000 shares on March 24, and that the right was not contingent upon his future employment at the Wilson Company.

■■■ The question as to whether a particular contract is an option to purchase or sell rather than a contract of sale is to be determined from a proper construction of the language of the contract in the light of the surrounding circumstances. (*Osgood v. Skinner* (1904), 111 Ill. App. 606, *aff'd on other grounds* (1904), 211 Ill. 229.) Even the name which the

parties may ascribe to such an agreement is not conclusive, and whether the contract is an option or obligation to purchase is to be determined by the nature of the obligations which it imposes. (See 17 Am. Jur. 2d *Contracts* §32 (1964).) Moreover, if deemed a stock option contract, it is subject to the same rules of construction as any other option, agreement, or contract, and the obligations thereunder are to be determined in accordance with the intent, conduct and purposes of the parties. See *Freeman v. Copper Range Co.* (7th Cir. 1957), 248 F.2d 20; *In re Estate of Brown* (1970), 130 Ill. App. 2d 514, 264 N.E.2d 287; *Postel v. Hagist* (1928), 251 Ill. App. 454.

It is plaintiff's position that his promise to pay 20¢ per share was consideration adequate to support the agreement. However, for purposes of assessing damages at trial, plaintiff valued the stock at approximately $5 per share.

It is defendants' position that if the $5 valuation placed on the stock is accurate, something other than 20¢ per share was contemplated as consideration. Defendants assert that consideration for the transfer of 10,000 shares was 20¢ per share and plaintiff's concurrent employment at the Wilson Company. In this respect we would note that in his complaint plaintiff alleged that the parties entered into the agreement "in order to insure his continued employment."

■■ Under these circumstances we conclude that upon entering into this contract the parties contemplated a stock option at 20¢ per share based upon plaintiff's continued employment, and not a straight and unconditional contract of sale at 20¢ per share.

Although plaintiff exercised his immediate right to purchase 4000 shares, which is not in dispute, plaintiff did not thereafter exercise his right to purchase the three subsequent blocks of 2000 shares each as they became due. As to the first two blocks, consisting of 4000 shares, plaintiff asserts that defendants' procrastination prevented him from exercising the right, and that his employment was wrongfully terminated prior to the time that his right to exercise the option as to the final 2000 share block matured.

In oral argument before this court defendants have conceded plaintiff's right to purchase the two additional blocks of 2000 shares each, which became available in 1970 and 1971. Defendants argue, however, that since plaintiff's employment was terminated in May 1972, prior to his right to exercise the final 2000 share installment in September 1972, he is not now entitled to that portion.

■■■ As a general rule an optionee has the right to exercise an option according to the terms of the agreement. However, because of the close relationship between a stock option granted by an employer to an employee and the latter's employment obligations, certain terms

regarding employment may be implied in such option agreements. (See Annot., 96 A.L.R.2d 194 (1964).) We have held above that plaintiff's right to the shares was contingent upon his employment. Since plaintiff was no longer in the employ of the Wilson Company on the date when the final portion would have been available, we find that plaintiff has not met the condition precedent and is not entitled to the final 2000 share block. We would note that even if termination of plaintiff's employment was without fault on his part, the equitable doctrine of apportionment may be applied. 5 Fletcher, Cyclopedia of the Law of Corporations §2143.1 (perm. ed. rev. 1976).

■■ We conclude that since the evidence does not support plaintiff's right to 2000 of the 6000 shares for which he brought suit, the damages awarded should be limited to the 4000 shares which defendants failed to deliver to plaintiff.

## II.

Defendants argue that the award of $30,000 is excessive. They maintain that since 6000 shares of Class B stock were at issue at trial (plaintiff having received 4000 shares in 1969), the jury erred in placing a value of $5.20 on each share. Plaintiff in this court agrees as to the valuation thereby determined for each share and contends that by deducting the agreed cost of 20¢, damages of $5 per share are amply supported by the record. Furthermore, although plaintiff prayed $100,000 damages in his complaint, he reduced his claim at trial for the 6000 shares to $30,000.

At the time of the agreement, all Class B stock in the Wilson Company was held by the Wilson family. Class B shares were not traded publicly and no market quotations were available. However, in determining the value of Class B shares, the parties stipulated at trial that while Class B shares were not freely convertible to Class A shares, in trying to value Class B, the jury could consider, among other things, the market price of the Class A shares which ranged between 4 and 5 1/4 on the three delivery dates in question. Moreover, as a further indication of the value of Class B shares, it may be noted that under certain circumstances 10 Class B shares were convertible to 11 Class A shares.

■■■ Awarding of damages in a contract action is a matter peculiarly within the province of the jury, and if the award is not against the manifest weight of the evidence, the judgment will not be altered. (*Flynn v. Zimmerman* (1960), 23 Ill. App. 2d 467, 163 N.E.2d 568.) We find that the factors outlined above provide ample support for a finding that Class B shares were worth approximately $5.20 per share and the damages recoverable at $5 per share. However, we have determined that plaintiff was entitled only to 4000 shares instead of 6000 as claimed. Therefore, we

believe the award of $30,000 is excessive and a remittitur in the amount of $10,000 is appropriate.

## III.

It is finally urged that not all three defendants are bound by the agreement in that Lawrence Wilson did not have authority to act with respect to the transfer of his parents' stock.

Lawrence Wilson testified that stock was sold to other employees by himself or on behalf of his parents. The agreement which Lawrence Wilson reached with plaintiff called for the immediate transfer of 2000 shares of stock belonging to Lawrence Wilson and 2000 shares owned by his parents. The agreement further called for the future transfer of 6000 additional shares, so that plaintiff would eventually be entitled to 10,000 shares "all bought at *our* base cost." (Emphasis added.)

■■ Plaintiff paid the Wilsons directly for their shares transferred to him. By transferring the shares and accepting the payment, we find that the Wilsons implicitly ratified the agreement made by their son. *Karetzkis v. Cosmopolitan National Bank* (1962), 37 Ill. App. 2d 484, 186 N.E.2d 72.

The Wilsons testified at trial. Although Mrs. Wilson testified that she did not appoint Lawrence Wilson to be her agent concerning her stock, she further testified that she agreed to whatever her husband agreed to concerning such matters. Milton Wilson testified that he did not recall the transfer of shares. However, he testified that when plaintiff quit, "the first thing I knew, it was my son, Lawrence, was pacifying Paul not to quit, and of course I wasn't going to interfere any further in the operation of the business, so I just went along and allowed him to remain in his job."

■■ We find that there was sufficient evidence from which a jury could have found that Lawrence Wilson had authority to act concerning the transfer of his parents' shares, and that all three defendants are therefore bound by the agreement.

## IV.

Consistent with the foregoing, and pursuant to our authority under Supreme Court Rule 366(a)(5) (Ill. Rev. Stat. 1975, ch. 110A, par. 366(a)(5)), plaintiff shall have 30 days within which to file a remittitur of $10,000. Upon the filing of such remittitur, the judgment will be affirmed; otherwise, the judgment will be reversed and the cause remanded for a new trial as to damages only.

Affirmed upon filing of a remittitur; otherwise judgment reversed and cause remanded for new trial as to damages.

SULLIVAN, P. J., and LORENZ, J., concur.