R.E. DAVIS CHEMICAL CORPORA-
TION, an Illinois corporation,
Plaintiff–Appellant,

v.

DIASONICS, INCORPORATED, a
California corporation,
Defendant–Appellee.

No. 90–1334.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1990.

Decided Feb. 8, 1991.

Sherwin J. Malkin, Chicago, Ill., for
plaintiff-appellant.

Thomas M. Knepper, George M. Hoff-
man, Neal, Gerber & Eisenberg, Chicago,
Ill., for defendant-appellee.

Before CUMMINGS, CUDAHY and
EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Though uncomplicated on its face, this contract dispute has spawned a protracted cycle of litigation. It presents puzzling questions of first impression regarding the manner in which the hypothetical expenses of a seller, avoided as a result of the buyer's premature breach, should figure in the lost profits damage calculus.

## I.

Diasonics is a Delaware [1] corporation engaged in the business of manufacturing and marketing medical diagnostic equipment. R.E. Davis Chemical Corporation (Davis), an Illinois business, contracted to purchase one such device, a .35 tesla nuclear magnetic resonance instrument (MRI), from Diasonics at the price of $1,500,000 pursuant to a written agreement dated February 23, 1984. By the terms of the agreement, upon payment of the full purchase price Davis was to be furnished a $225,000 research grant "based on [an] approved program of development activities." Appellee's Br. at 3. The agreement also afforded Davis the option to upgrade the MRI to a high-field/spectroscopy system by June 1, 1985—approximately 15 months after delivery of the MRI was scheduled—at an additional cost of $700,000. Davis advanced a $300,000 deposit for the MRI but failed to take delivery, thereby breaching the contract. After Davis repudiated the contract, Diasonics resold the MRI to a third party at the contract price.

When Diasonics refused to refund the $300,000 deposit, Davis filed suit demanding return of the downpayment pursuant to section 2–718(2) of the Uniform Commercial Code (the UCC). Ill.Rev.Stat. ch. 26, para. 2–718(2) (1985). Diasonics counterclaimed, alleging that it was entitled to recover the profit it lost on the sale under UCC 2–708(2) because it was a lost volume seller. Ill.Rev.Stat. ch. 26, para. 2–708(2) (1985). The district court entered summary judgment for Davis, holding that lost volume sellers are not eligible for recovery of lost profits but rather are limited to damages measured by the difference between the resale price and the contract price together with incidental damages under UCC 2–706(1). Ill.Rev.Stat. ch. 26, para. 2–706(1) (1985). Concluding that the Illinois Supreme Court would follow the majority of jurisdictions, which allow lost volume sellers to recoup their lost profits under UCC 2–708(2), we reversed and remanded the case with instructions that

> the district court calculate Diasonics' damages under 2–708(2) if Diasonics can establish, not only that it had the capacity to make the sale to Davis as well as the sale to the resale buyer, but also that it would have been profitable for it to make both sales ... [and that Diasonics] probably would have made the second sale absent the breach.

*R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 685 (7th Cir.1987) (*Diasonics I*).

On remand, Diasonics filed a motion in limine to preclude Davis from introducing evidence of the additional expenses Diasonics would have been forced to incur had Davis performed its part of the bargain and elected to exercise the upgrade option. The district court granted this motion at the start of the three-day bench trial. Concluding that Diasonics had adequately established damages for its lost profit amounting to $453,050, the district court ultimately entered judgment for Diasonics in the sum of $153,050 ($453,050 less the $300,000 deposit which Diasonics retained).

On appeal, Davis challenges the district court's verdict on the following grounds. First, Davis would prohibit Diasonics from recovering the profit it lost on the sale because Diasonics failed to precisely identify the buyer to whom it resold the MRI. Davis also quibbles with Diasonics' damage computations, asserting that they are inconsistent, incomplete and unreliable. In their stead, Davis proffers its own more favorable accounting figures. Finally, Davis contends that the district court erred

---

**1.** Although currently incorporated in Delaware, at the time this suit was filed Diasonics was incorporated under the laws of the state of California. Diasonics' principal place of business remains in California.

by refusing to allow it a $225,000 credit for the research grant and by excluding evidence of the loss Diasonics would have sustained had Davis exercised its upgrade option.

## II.

Ordinarily, a seller's damages for a buyer's breach of contract are measured by the difference between the contract price and the market price. In some situations, however, this sum is inadequate to place the seller in as good a position as performance would have done. For example, a broken contract costs a lost volume seller—one with a finite quantity of customers and the capacity to make an additional sale—its profit on one sale. To be made whole, a lost volume seller must thus recover damages equal to the profit it lost on the sale.

In accordance with this reasoning, in *Diasonics I*, 826 F.2d at 681, we adopted for the first time in Illinois the rule that a lost volume seller is entitled to recoup its lost profit. We held that in order to qualify as a lost volume seller, a plaintiff must establish the following three factors:

(1) that it possessed the capacity to make an additional sale,

(2) that it would have been profitable for it to make an additional sale, and

(3) that it probably would have made an additional sale absent the buyer's breach.

*See id.* at 685.

### A. *Lost Volume Seller Status*

■ Diasonics has adduced ample evidence to establish its status as a lost volume seller. The evidence is undisputed that Diasonics possessed the capacity to manufacture one more MRI. Diasonics also demonstrated that it was, in the words of Judge Kocoras, "beating the bushes for all possible sales." Tr. at 3. Douglas McCutcheon, controller of Diasonics' MRI Division, testified at trial that Diasonics' sales force pursued "every possible lead" and attempted to "identify every possible qualified customer" in 1984. Appellee's Br. at 9.[2] The fact that Diasonics was still a young company struggling to acquire business in an extremely competitive market at the time of Davis' breach lends independent corroboration to McCutcheon's statements. Based upon this evidence, the district court's finding that Diasonics probably would have made an additional sale but for Davis' breach is not clearly erroneous.

Davis offers no evidence to controvert the proof adduced by Diasonics that it both possessed the capacity to manufacture additional MRIs and was actively soliciting every possible customer for MRI sales in 1984. Instead, Davis clutches at one footnote in our previous opinion to justify its contention that Diasonics must precisely identify the resale buyer.[3] In this case, it appears that the generic MRI units manufactured by Diasonics were interchangeable and thus were not identified to any particular customer until just prior to delivery. *See* Appellee's Br. at 13. The mere fact that Diasonics was unable to specify the particular unit Davis contracted to buy and trace the exact resale buyer for that

---

**2.** McCutcheon explained that Diasonics' sales persons were doing

[e]verything they could possibly do to identify persons who were interested in MRI or even who had the capabilities to purchase MRI ... [and] continuing at all times to obtain any and all possible orders for [the] MRI product.... The sales process for MRI was so complex and involved so many variables that [they] could not, in advance, decide which accounts or which potential prospects would eventually buy from Diasonics ... [so], in order to maximize ... completed sales, [they] had to take every possible prospective sale down the path of complete negotiations at all times.

Appellee's Br. at 9–10.

**3.** Footnote 13 of *Diasonics I* sets forth one commentator's three-factor test for determining whether a buyer's breach has resulted in loss of sales volume:

(1) the person who bought the resold entity would have been solicited by plaintiff had there been no breach and resale,

(2) the solicitation would have been successful, and

(3) the plaintiff could have performed the additional contract.

*See Diasonics I*, 826 F.2d at 683 (quoting Harris, *A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared*, 18 Stan.L.Rev. 66, 82 (1965)).

unit thus should not foreclose it from recovering lost profits. Without more evidence, we decline to impose upon Diasonics the burden of proving the exact buyer who purchased this particular system in order to qualify as a lost volume seller.

## B. Damage Calculations

■ Davis also takes issue with Diasonics' damage calculations, asserting that they are unreliable because they employ average costs rather than actual costs, are inconsistent with other figures presented during litigation or displayed on Diasonics' profit and loss statements, inaccurately include certain revenues that were not received while omitting certain costs, and erroneously contain revenues from the sale of a different type of MRI unit. But Diasonics need only prove its damages with reasonable certainty, not with mathematical precision. *See* UCC 1–106 comment 1; Restatement (Second) of Contracts § 352 (1981). Moreover, the district court's conclusions regarding Diasonics' computations constitute factual determinations that cannot be overturned unless clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Teradyne, Inc. v. Teledyne Indus., Inc.*, 676 F.2d 865, 869 (1st Cir.1982) (master's finding that cost statements were reliable not reversible unless clearly erroneous). After all, the district court accepted Diasonics' figures and rejected the numbers proffered by Davis based in part upon its assessment of the credibility of their respective accountants. *See* Tr. at 11. Even if this court would weigh the evidence differently were it sitting as trier of fact, the district court's judgment with respect to the accounting methods utilized to obtain these figures should stand unless it is clearly unreasonable. The district court's decision certainly satisfies this standard.

## C. Research Grant

■ The district court refused to deduct $225,000 from Diasonics' damages, ruling that the conditions precedent to provision of the research grant—payment of the full contract price and approval of a program of development activities—had not been satisfied. Simple reliance upon Davis' failure to comply with the conditions precedent to payment of the research grant, however, effectively skirts the true question at issue here—whether the research grant was what it purported to be or was really a discount masquerading in other garb. If the research was indeed genuine and would have redounded to Diasonics' benefit, then Diasonics is not obliged to dole out $225,000. But if both parties understood the research grant to be a type of rebate, automatically payable upon receipt of the MRI in return for practically worthless information, then Davis should receive a $225,000 credit on the damages it must pay Diasonics. Davis' breach does not entitle Diasonics to gain more than the benefit of its bargain. Upon remand, the district court must thus determine whether the research grant served merely as a disguised discount from the purchase price, or whether it constituted an independent exchange supported by genuine consideration.[4]

## D. Upgrade Option

The last and most complex issue entails a similarly fact-intensive inquiry into whether the upgrade arrangement constitutes a true option or, rather, an integral and enforceable provision of the original contract. Illinois courts generally hesitate to enforce options unless the option holder has clearly availed itself of the right by performing all conditions precedent to its exercise. *See, e.g., Southwest Forest Indus., Inc. v. Sharfstein*, 482 F.2d 915, 924 (7th Cir.1972)

---

**4.** The district court emphasized that the research to be undertaken would have been useful to Diasonics but also observed that Diasonics habitually afforded its customers some form of discount due to the highly competitive nature of the MRI market. *See* Tr. at 12. Although the district court mentioned this conflicting evidence, its ambiguous pronouncements fail to elucidate the precise reasons behind its decision to deny Davis credit for the research grant. The district court may have considered this conflicting evidence and concluded that the research was actually valuable to Diasonics. Or it may simply have relied upon the condition precedent analysis to hold that the $225,000 was not owed until payment of the full purchase price.

("Illinois law is particularly adamant in requiring that option contracts be strictly construed and that an option be considered exercised only if the person holding the opting power adheres exactly to the conditions precedent to its effective consummation."). This particular care probably reflects the potential for unfairness when allowing an option holder to benefit from an agreement by which it could not have been bound. Reasoning that Davis failed to comply strictly with the condition precedent to exercise of the option by repudiating the contract, the district court accordingly excluded evidence of the losses Diasonics would allegedly have sustained had it performed the upgrade.[5]

If the upgrade were a virtual certainty, however, the expenses of conveying a high-field/spectroscopy system that Diasonics avoided as a result of Davis' breach should certainly figure in the lost profits damage calculus. Davis presented some evidence to suggest that the upgrade provision, though couched in option terminology, was actually an integral part of the original bargain.[6]

Courts are often forced to divine the true meaning of such ambiguous arrangements. In *Joseph v. Wilson*, 57 Ill.App.3d 212, 14 Ill.Dec. 831, 372 N.E.2d 1110 (1978), for example, the Illinois Appellate Court engaged in essentially the same inquiry, determining whether an agreement allowing an employee to purchase shares of stock constituted an option to purchase contingent upon employment or an outright contract of sale. "Even the name which the parties may ascribe to such an agreement is not conclusive," the court declared, construing the language of the contract in light of the surrounding circumstances. *Id.* at 216–17, 14 Ill.Dec. at 834; 372 N.E.2d

at 1113. Because the contract guaranteed the plaintiff the right to purchase stock valued at five dollars per share for only 20 cents per share, the court held that the agreement must have contemplated some additional consideration, namely the plaintiff's continued employment. *Cf.* Restatement (Second) of Contracts § 240 (contract is divisible only if it can be divided into corresponding pairs of part performances in such a way that a court may treat the parts of each pair as agreed equivalents).

Courts perform an almost identical task in the myriad cases where they must gauge whether an agreement constitutes a sale or a lease for the purpose of secured transactions law. In *In re AAA Machine Co.*, 30 B.R. 323 (Bankr.S.D.Fla.1983), for example, the court compared the option price to the original purchase price and the fair market value of the property to determine whether the contract was a true lease or a security agreement. The court reasoned that, when the option allows purchase of the property for purely nominal consideration, the only "economically sensible" course for the lessee is to exercise its power to purchase at the end of the lease term. The court recognized that under such circumstances the lease in reality functions as a security agreement. *See also In re United Nesco Container Corp.*, 47 B.R. 230 (Bankr.E.D. Pa.1985) (construing lease containing option to purchase computer equipment worth between $5,000 and $10,000 for only $1 as a sale); *In re Duprat*, 28 B.R. 109 (Bankr.D.C.Vt.1983) (construing lease-purchase agreement for trailer as a contract of sale because the agreement provided that lessee would pay for all repairs, park rent, taxes and insurance, expenses which are ordinarily the responsibility of the owner).

Appellant's Br. at 26–27.

---

**5.** The district court granted Diasonics' motion in limine to exclude Davis' evidence, declaring that whatever the intention to exercise the option was, the contract was breached in the first instance. The main unit was not purchased and sold in accordance with the original contract.... [I]t may have been the intention when the contract was drafted, and I assume it may well have been a likelihood had the contract been satisfied in the first instance, but we never got to that point.

**6.** Davis introduced evidence that it specially designed the MRI building to house the more powerful highfield/spectroscopy system. *See* Appellant's Br. at 29. Moreover, it appears that Diasonics itself initially characterized the upgrade provision as an enforceable part of the original agreement when it counterclaimed seeking additional damages for the profits it lost by Davis' failure to upgrade. *See id.* at 25.

■ Attempting to realize the true intentions of the parties does not require us to engage in abstract calculations of theoretical probabilities. Avoiding the thicket of academic economics, we opt for a pragmatic approach. Only when the evidence demonstrates a substantial likelihood that the option would have been exercised and persuasively establishes the value of the option should that value figure in the calculation of damages. *Cf. Unique Systems, Inc. v. Zotos Int'l, Inc.*, 622 F.2d 373, 379 n. 6 (8th Cir.1980) (refusing to allow recovery of lost profits when probability that defendant would have exercised option to purchase additional units was too speculative).

Without more evidence, it is impossible to determine whether Davis' upgrade option should enter into the calculation of Diasonics' lost profits. Certain principles may be distilled from a number of diverse contract interpretation cases to guide in this inquiry. Upon remand, the district court should determine the probability that the option would have been exercised by examining the following non-exhaustive set of factors:

(1) the importance of the option to the original bargain,

(2) the relationship between the option's value and the additional $700,000 Davis was required to pay, and

(3) the relationship between the value of the MRI Davis contracted to buy and the original contract price.

If the original contract price was inflated and the additional $700,000 essentially nominal in relation to the value added to the MRI by the upgrade, then both parties may have understood that the only economically rational course available to Davis was to purchase the upgrade. Under such circumstances, Davis would probably have exercised its option. But if the additional $700,000 even roughly approximated the value added to the MRI by the upgrade, Davis may well have chosen not to exercise the option.

### III.

Diasonics is entitled to the benefit of its bargain, no more, no less. Although we hesitate to burden district courts with impossibly complex damage computations, we remand for further consideration of the evidence with respect to the research grant and the upgrade option. The district court's entry of judgment is thus AFFIRMED IN PART, REVERSED IN PART, AND REMANDED for further proceedings not inconsistent with this opinion.