**Kenneth M. LLOYD, Plaintiff,**

v.

**CLASSIC MOTOR COACHES, INC., and Herbert Swan, Defendants.**

**Civ. A. No. C 74–1 Y.**

United States District Court,
N. D. Ohio, E. D.

Nov. 22, 1974.

John D. Liber, Cleveland, Ohio, for plaintiff.

Robert W. Boughton, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

This action was tried to the Court on September 6, 1974. In addition to oral testimony offered at said hearing, the parties stipulated to the introduction into evidence of the transcript of testimony taken in Civil Action No. C 73–610 Y and the exhibits entered into evidence therein. The following shall constitute the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

### JURISDICTION

Plaintiff invokes the jurisdiction of this Court under 28 U.S.C., § 1332. Finding that there exists complete diversity of citizenship and that the amount in controversy exceeds $10,000.00, exclusive of interests and costs, the Court finds that it has jurisdiction of this action.

### FINDINGS OF FACT

The evidence illustrates that plaintiff Kenneth M. Lloyd (hereinafter Lloyd), a physician, went to Miami, Florida, in early December of 1972, for a meeting of the American Academy of Dermatology. While in Florida, Lloyd visited the place of business of defendant Classic Motor Coaches, Inc. in Fort Lauderdale. Defendant Herbert Swan, the owner of Classic Motor Coaches, offered his assistance to Lloyd and his wife. The Lloyds were shown several automobiles, including a Rolls Royce Silver Shadow, SRX 1201. This car was maroon and silver two-tone, with a blue interior; the odometer read 48,000 miles. Swan informed the Lloyds that this car was a 1967 Rolls Royce. When asked why this car had so few miles on it for its age, Swan stated that this had been the personal automobile of the wife of a Rolls Royce dealer in New Jersey, and that because of this, it had been well maintained and not often used. The Lloyds also noticed that there was a water mark on the back left corner of the passenger compartment. When asked about this, Swan explained that this was not uncommon in cars driven in Florida because of the humidity problems. When the Lloyds noted that the maroon paint appeared to be wavy and thus imperfect, Swan explained that the previous owner had preferred this color and that it had been painted without removing all the wax. The Lloyds declined to have it repainted. To establish confidence in himself and his dealership, Swan informed the Lloyds of a previous buyer of a Rolls Royce who, upon informing his wife of his purchase, was forced by her strenuous objections to the purchase to ask to return the car. Mr. Swan told the Lloyds that he willingly returned the purchaser's money and took the car back.

Being interested in purchasing this Rolls Royce, the Lloyds test drove it for several blocks. Although several minor difficulties appeared during this test drive, Swan assured the Lloyds that these problems could easily be rectified. The parties' negotiations culminated in Lloyd's signing a purchase agreement to purchase the car for Fourteen Thousand, Four Hundred Dollars ($14,400.00). Lloyd thereupon tendered his check for Four Thousand, Four Hundred Dollars ($4,400.00) upon the understanding that the balance would be paid, by certified check, upon delivery in Youngstown, Ohio.

The purchase agreement signed by the Lloyds was a standard form containing the following phrase:

"We the dealer warranty this car for 30 days after date of delivery on a 50–50 retail basis of parts and labor used. Owner pays half and dealer pays half of total retail cost of parts and labor used."

In response to the Lloyds' insistence, Swan altered this standard form to read as follows:

"We the dealer warranty this car for 30 days after date of delivery on a 100 percent unconditional."

Mr. Lloyd had repeatedly told Swan that he knew nothing of mechanics and that he wanted this automobile in perfect mechanical order. Swan assured him that he would go over the car meticulously and that it would be in fine running order.

This automobile was delivered by Swan's son on December 16, 1972, at around 11:30 p. m. Lloyd tendered his certified check for $10,000.00 and took possession of the car. The next morning Lloyd went out to take a drive in his new car. The car wouldn't start. Luckily an acquaintance had jumper cables and was able to start the car. Thinking little of this incident, Lloyd later that day again attempted to start the car in order to show it to several of his friends. Again the automobile would not start.

When Lloyd took possession of the car, it was equipped with five-day license plates, rather than the 20-day plates promised by Swan. As Lloyd did not receive title to the car upon delivery, he was unable to obtain license plates for the car immediately upon the expiration of the temporary plates. Lloyd received the title on the 23rd or 24th of December, 1972; as this was Christmas Eve weekend, he was unable to attempt to get plates until the 27th of December, 1972. Thus, Lloyd's use of the car was severely limited during this period.

After being informed that a safety inspection was a prerequisite to obtaining license plates, Lloyd took this automobile to Barrett Cadillac on December 27, 1972 for a safety inspection. Remembering the difficulty he had had with the windshield wipers, horn, and possibly the battery, Lloyd asked Mr. Barrett to check into these matters in addition to the safety inspection. Mrs. Lloyd picked the car up on the 29th of December 1972; thereafter Lloyd was able to obtain license plates for the car. However, Barrett refused to perform any mechanical work on this automobile, explaining that his mechanics were not versed in handling this type of automobile.

Lloyd drove the car to work for the next couple of days. Lloyd testified that on January 1, 1973, "All of a sudden everything just stopped, the power steering, the motor, everything just went dead, right in the middle of the highway." Lloyd thereupon coasted the car to European Imports. He attempted to start the car to no avail. As no one was present at this establishment, he walked to the nearest telephone booth to call his wife and she came and picked him up. He left the car there hoping it could be repaired the following day.

On January 15, 1973, European Imports called to inform Lloyd that the repairs on the automobile had been accomplished. Upon his arrival, a mechanic went to get the car. It would not start. European Imports kept the car another three days.

From the day the car was delivered, Lloyd had numerous problems with it. The heating and air conditioning systems, the power steering, the windshield washers and wipers, the electrical systems, the horn, etc. all failed to perform properly. European Imports attempted to fix these problems and put the car in fine running order. Classic Motor Coaches, Inc. paid the bill for these repairs.

On January 18, 1973, Lloyd picked the car up from European Imports. The car operated, though with difficulty, until January 24th of that year, when it was returned to European Imports for additional repairs.

European Imports was again able to get the car started. Mr. Swan paid the bill. At about this time Lloyd spoke to Swan. Lloyd suggested that apparently the car would not be fixed at European Imports and that he ought to take it to Qua Buick in Cleveland, an authorized Rolls Royce dealer. Lloyd attempted to keep the cost down for Mr. Swan by driving it there, rather than having it towed. Examination of this automobile by Qua Buick's mechanics revealed substantial difficulties which would cost several thousand dollars to repair. Mr. Swan refused to pay for these repairs.

He offered to buy this automobile back from Mr. Lloyd for $9,000.00. The automobile was stored at Qua Buick for fifty-one (51) days at a cost of $3.00 per day. Finding himself at an impasse, and in an attempt to avoid sinking any more money into this automobile, Lloyd took the car to his garage and it has been there ever since.

Beginning with the initial difficulties, Lloyd frequently telephoned Swan to inform him of the circumstances. On January 6, 1973, Lloyd wrote Swan a letter informing him of Lloyd's desire to return the car in exchange for the purchase price. Lloyd offered to pay the cost of returning the car. On January 12, Swan responded; he refused to take the car back.

It appears that Rolls Royce keeps records of all its cars sold in this country. These records reveal that between January of 1971 and August of 1973 this automobile had been stolen. These records also reveal that by May of 1970 this automobile had been driven nearly 60,000 miles. Further, these records reveal that this was actually a 1966 Rolls Royce Silver Shadow. Swan was unaware of the availability of these records prior to the instant sale.

Swan purchased this automobile in mid-November of 1972. The seller was required by New York law to certify the mileage on the automobile. Although the odometer read approximately 48,000 miles, the seller certified that the true mileage was unknown as of the date of sale. Apparently this is the result of the car having once been stolen. Although Swan had possession of this certification prior to delivery of the automobile to Lloyd, he had not actually examined it and therefore had no knowledge as to the true mileage of the automobile.

## CONCLUSIONS OF LAW

In his complaint, plaintiff advanced three theories in support of his recovery in this action:

1. Recission for a material breach of the contract;

2. Breach of warranty;

3. Recission and punitive damages for fraud.

Lloyd has abandoned his breach of warranty claim and now relies solely upon the first and third theories.

■ The initial question presented for determination by the Court involves choice of law. This contract was formed in Florida and was to be performed in Ohio. There was no specific agreement between the parties respecting what state's law shall govern this transaction. However, the contract of sale notes that "Not tax, out of state." Furthermore, the automobile and the certificate of title were to be delivered in Ohio and the automobile was to be driven, serviced and maintained in Ohio; the Court finds that these facts demonstrate that the parties' transaction bears "an appropriate relation" to Ohio, and therefore that Ohio law is applicable. Section 1301.05 of the Ohio Revised Code (UCC 1–105).

The Court will first consider plaintiff's claim for recission because of material breach of the contract. Article 2 of the Uniform Commercial Code, enacted into law in Ohio with modifications not relevant herein, provides a comprehensive scheme for the sales covered therein.

As the Court concluded that this Article (§ 1302.01–§ 1302.98 Ohio Revised Code) is applicable to the instant case, analysis of the claim will proceed under the Uniform Commercial Code.

The official comment to Section 1302.-66 of the Ohio Revised Code (UCC 2–608) provides:

"The section no longer speaks of 'recission,' a term capable of ambiguous application either to transfer of title to the goods or to the contract of sale and susceptible also to confusion with cancellation for cause of an executed or executory portion of the contract. The remedy under this section is instead referred to simply as 'revocation of acceptance' of goods tendered under

a contract for sale and involves no suggestion of 'election' of any sort."

■ The Court is of the opinion that with the exception of cases where the seller has committed fraud, mistake, or the like, the buyer's only rights to return the goods are those stated in Article 2 of the Uniform Commercial Code. See White and Summers, Uniform Commercial Code, § 8–1 (1972); 1 N.Y. State Law Revision Commission, 1955 Report 528 (1955); Lawner v. Engelbach, 433 Pa. 311, 249 A.2d 295 (1969), cf. Sarnecki v. Al Johns Pontiac, 3 U.C.C. Rep.Serv. 1121 (Pa.C.P.1966).

As the remedies provided by the Code vary depending upon whether the goods were accepted, rejected, or revoked, the first question is whether Lloyd accepted the automobile in this case. Section 1302.64 (UCC 2–606) provides that acceptance of goods occurs when the buyer:

"(1) after reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(2) fails to make an effective rejection as provided in subdivision (A) of section 1302.61 of the Revised Code, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller, it is an acceptance only if ratified by him."

In this case, obviously the automobile was nonconforming to the contract.

Lloyd never signified to the seller that he would take or retain it in spite of this non-conformity; nor is subparagraph (3) of the above quoted provision applicable.[1]

Thus the question becomes whether or not Lloyd has effectively rejected this automobile.

Revised Code Section 1302.61 (UCC 2–602) in pertinent part provides:

"A. Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller. . . ."

■ In this case, Lloyd received the automobile on December 16, 1972; because of the delay in delivery of the title and thus in obtaining license plates, Lloyd's utilization of this auto was minimal until about the 29th or 30th of December, 1972. The automobile went into the garage on January 1, 1973 and was still there on the date of Lloyd's letter to Swan asking for the return of the purchase price. This letter was an attempted rejection. Due to the difficulty of discovering the extent of the defects, Lloyd's limited mechanical experience, and the limited opportunities to discover the defects, the Court finds that January 6 was within a reasonable time after delivery. Thus, Lloyd effectively rejected this car as of that date.

Ohio Revised Code Section 1302.85 (UCC 2–711) enumerates Lloyd's remedies. In pertinent part this section provides:

"(A) Where . . . the buyer rightfully rejects . . . then with respect to any goods involved, and with respect to the whole if the breach goes to the

1. Since any act of possession or otherwise by Lloyd was theoretically inconsistent with defendant's ownership, this could not be the intended meaning of the phrase in question. The only interpretation of this provision which gives effect to the provisions of subparagraph (1) quoted above, specifically the buyer's reasonable opportunity to inspect under § 1302.64(A)(1) (UCC 2–606(1)(a)) and his reasonable time to reject under §

1302.61 (UCC 2–602) and still give effect to the Code's policy of encouraging parties to work out their differences and so to minimize losses resulting from defective performance, would be to interpret subparagraph (3) above as not applying to acts done in ignorance of the defects which the buyer should not have discovered within a reasonable time after delivery.

whole contract, as provided in section 1302.70 of the Revised Code, the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid:

(1) 'cover' and have damages under section 1302.86 of the Revised Code as to all the goods affected whether or not they have been identified to the contract; or

(2) recover damages for non-delivery as provided in section 1302.87 of the Revised Code."

■ Thus Lloyd is entitled to the return of his purchase price of $14,400.00 and any incidental or consequential damages established by the evidence. Section 1302.89 describes the incidental and consequential damages intended to be covered by the Uniform Commercial Code. This section in pertinent part provides:

"A. Incidental damages resulting from seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"B. Consequential damages resulting from the seller's breach include:

(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . ."

■ The Court is of the opinion that Lloyd has suffered no consequential damages, and that he is entitled to the following incidental damages:

| | | |
|---|---|---|
| 1. | Repair and storage charges at Qua Buick | $254.04 |
| 2. | Insurance costs | 302.00 |
| 3. | Delivery expenses | 120.00 |
| 4. | Tax | 400.00 |
| 5. | Telephone charges | 23.33 |
| 6. | License plates | 10.95 |
| 7. | Car Title | 1.00 |
| 8. | Interest at the rate of 6% on $14,400.00 from January 6, 1973 | 1,620.00 |

Plaintiff's third claim for relief demands punitive damages for defendant's alleged fraud.

■ The Code has specifically expanded the remedies for fraud to include the above mentioned remedies. See Revised Code Section 1302.95 (UCC 2–721). Thus, if the elements of fraud are proven and the Court finds them justified, punitive damages would be available to plaintiff.

In Ohio, the elements of actionable fraud are:

"1. A false representation; actual or implied, or the concealment of a matter of fact, material to the transaction, made falsely.

2. Knowledge of the falsity—or statements made with such utter disregard and recklessness that knowledge is inferred.

3. Intent to mislead another into relying on the misrepresentation.

4. Reliance—with a right to rely.

5. Injury as a consequence of that reliance.

All of these elements must be present if actionable fraud is to be found." Crabbe v. Freeman, Ohio Mun., 160 N.E.2d 583, 585, 81 O.Law Abst. 65, 67 (1959).

■■ In this case at least Swan's sworn statements as to the mileage of this automobile on the date of purchase satisfy each of these conditions. Therefore plaintiff is also entitled to rescind this contract for fraud. However, the

Court declines to award punitive damages in this case.

Accordingly, the Court finds that defendants are indebted to plaintiff in the amount of $17,131.32, and that the Rolls Royce Silver Shadow SRX 1201 is the property of defendants. Defendants to pay the costs of this action.

It is so ordered.