NO. 4-01-0062

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

MAGNUM PRESS AUTOMATION, INC., an ) Appeal from

Illinois Corporation, ) Circuit Court of

Plaintiff-Counterdefendant- ) Jersey County

Appellant,               ) No. 99LM20

)

THOMAS & BETTS CORPORATION, a Maine ) 

Corporation, ) Honorable

Defendant-Counterplaintiff- ) Thomas G. Russell,

Appellee.                    ) Judge Presiding.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

Plaintiff Magnum Press Automation, Inc. (Magnum), appeals an adverse verdict on its claim against defendant Thomas & Betts Corporation (T&B) and also a verdict in favor of T&B on T&B's counterclaim, both rendered after a bench trial commencing May 17, 2000.  Magnum's brief is difficult to follow, to say the least.  A verbatim reprint of its recitation of the standard of review is illustrative:

"The standard of review of the issues 

ruled on by the trial court is based on find-

ings of fact by the trial court and require 

findings by this reviewing court of such 

findings being against the manifest weight 

of the evidence or no evidence on which the 

trial court based its finds.  
Authority as 

this standard are contained in the argument."

Magnum manufactures industrial presses.  T&B purchased three presses from Magnum.  Press 1 was satisfactory.  T&B encountered problems with the power unit of press 2.  At the time, Magnum was in the process of completing press 3.  Magnum replaced power unit 2 with the unit originally meant for press 3.  Magnum brought power unit 2 back to its plant, performed maintenance on it, and in turn sent it out again with press 3.

Press 3 was shipped on July 31, 1998, and arrived at T&B's plant on August 6.  Press 3 quickly began having problems.  T&B's lead maintenance mechanic, Mark Parent, called Magnum's chief engineer, Pat DeStefano, on September 3, 1998, regarding problems with the unit.  Specifically, the valves of the power unit appeared to be clogged with debris.   DeStefano told Parent the power unit needed to be cleaned.  Parent cleaned the power unit but problems again soon developed.  According T&B, it next called DeStefano on September 15.  DeStefano again recommended cleaning and Parent again complied but again unit 3 would not function properly.  T&B tried to contact DeStefano on September 24, but according to T&B, DeStefano was not available.  T&B also states that around this time it asked DeStefano to come to T&B's plant to fix the unit but that DeStefano merely continued to make suggestions over the telephone.  According to DeStefano, throughout this time he would be contacted by Mark Parent of T&B, give Parent directions, then not hear from Parent for two weeks or more.  During these interims he claimed to assume that the press was running properly.  On or before October 12, 1998, T&B decided to discontinue using press 3.

Some discussions regarding the problems with press 3 had also occurred at senior levels of management.  Mike Hamilton, the president of Magnum, testified that in late September he talked to Paul Burbank, manufacturing manager of T&B.  Burbank told Hamilton that press 3 was not operating correctly, apparently due to contamination in the system.  Hamilton informed Burbank that this presented a maintenance issue and was therefore not a warranty issue.  Hamilton was of the opinion that any debris found in the system would eventually work its way into the unit's filters or would be removed during routine maintenance.  Hamilton also claims that he verbally offered to take the press back in order to work on it.  Burbank denies this offer was made.  (Burbank also believes that this conversation took place closer to October 16.)  

In the meantime, T&B was withholding payment of the final two-thirds of its payment on the press.  Hamilton then sent a series of letters to T&B.  In a letter of November 16, 1998, he again asserted that the problem must be one of a continuing nature, noting that Magnum had flushed the power unit twice and that T&B had assumably done so at least once.  On December 4, Magnum's attorney wrote T&B, again denying that Magnum's workmanship was causing the problems with the unit.

Unbeknownst to Magnum, by early November T&B had hired a third party, Northland-Willette (Northland), to work on press 3.  Northland flushed and cleaned power unit 3, discovering debris in the oil reservoir.  The unit was filled with clean oil but again failed.  More contamination was found in the reservoir.  The unit was operational after this debris was removed, but it was feared that some contamination may have worked its way in the cylinders of the power unit.  Press 3 was therefore shipped to Northland for further maintenance.

Northland disassembled the press, removing a handful of metal drill chips as well as performing other tasks, but could not get it to operate properly.  Northland again dissembled the machine, cleaned it again, and performed other work.  Northland was again unsuccessful.  T&B eventually told Northland to cease its efforts.  

At some unspecified point, certain facets of the press' computer programming had been altered.  Specifically, it appears that a safety feature required the operator to press certain buttons during each pressing.  T&B admitted that one of its employees had altered the program to bypass this procedure.  According to T&B, this was done so as to allow continuous testing of the machine without the necessity of constant attention.  T&B also claims that DeStefano or other employees of Magnum told T&B how to change the program.  For its part, Magnum did not deny T&B's allegations but nonetheless asserted that this change in programming contributed to the problems the press experienced.  Magnum did not specifically explain how or why this was true.

On December 17, 1998, T&B sent Magnum a letter revoking acceptance of press 3.  On December 21, 1998, Magnum responded with a letter offering to take press 3 back and repair it to T&B's satisfaction.  T&B did not accept that proposal.  Magnum introduced testimony that when it finally received the press and power unit, it found that two valves had been incorrectly switched with each other.  It also noted the change in programming previously mentioned. 

After T&B rejected Magnum's proposal, Magnum sued for the outstanding balance on the press, $30,225, plus interest.  T&B counterclaimed for $27,600.35:  $16,275 representing its paid deposit and $11,325.35 representing various charges for Northland's services.  The trial court found in favor of T&B on both Magnum's claim and T&B's counterclaim, awarding T&B $27,600.35 plus $1,335.85 for interest accruing from the date of T&B's revocation of acceptance, December 17, 1998.

On appeal, we are (apparently) asked to consider (1) whether the trial court correctly found that Magnum had been afforded adequate opportunity to cure the defects in press 3; (2) whether the trial court correctly found that T&B had properly revoked its acceptance of press 3; (3) whether the trial court properly allowed T&B's claim for the cost of Northland's work; (4) whether the trial court properly excluded Magnum's evidence of the allegedly simple corrections necessary to actually repair press 3; and (5) whether the trial court erred in allowing T&B to amend its complaint following trial so as to include a claim for prejudgment interest. 

I. MAGNUM'S OPPORTUNITY TO CURE

Magnum seems to argue on appeal that T&B's revocation was invalid because Magnum was not allowed the opportunity to cure any defects in the press or the power unit.  Section 2-508(1) of the Uniform Commercial Code (UCC or Code) provides "Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery."  810 ILCS 5/2-508(1) (West 2000).  We cannot agree that section 2-508(1) operates to save this transaction.  T&B produced ample evidence that over a course of months it had repeatedly complained to Magnum about the operation of the press.  It also produced evidence that Magnum did not attempt to inspect the press and, indeed, disclaimed any responsibility for curing the problem.  Magnum may dispute this evidence but determination of the matter fell within the province of the trier of fact, in this case the court.  The court's determination was not against the manifest weight of the evidence.

II. T&B'S REVOCATION OF ACCEPTANCE

Magnum also apparently argues that T&B's revocation of acceptance of press 3 was improper, although again, Magnum's presentation of its position somewhat hampers our understanding.  Section 2-608 of the UCC provides in part as follows:

"Revocation of Acceptance in Whole or in 

Part.  (1) The buyer may revoke his acceptance 

of a lot or commercial unit whose non-confor-

mity substantially impairs its value to him 

if he has accepted it 

(a) on the reasonable assumption 

that its non-conformity would be cured 

and it has not been seasonably cured; or

(b) without discovery of such non-

conformity if his acceptance was reason-

ably induced either by the difficulty of 

discovery before acceptance or by the 

seller's assurances.

(2) Revocation of acceptance must occur 

within a reasonable time after the buyer dis-

covers or should have discovered the ground 

for it and before any substantial change in 

condition of the goods which is not caused 

by their own defects.  It is not effective 

until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same 

rights and duties with regard to the goods 

involved as if he had rejected them."
  810 

ILCS 5/2-608 (West 2000).

Magnum argues that 
the change in the computer programming and the switched valves constitute a "substantial change in the condition of the goods," precluding revocation.  Magnum's position seems to be somewhat inconsistent with its overall argument, for elsewhere Magnum seems to claim that the ease in which these conditions were remedied indicates the unreasonableness of both T&B's position and also the costs charged by Northland.  In any event, whether these changes were substantial in nature was a question to be resolved by the trier of fact and we do not find the court's judgment to be against the manifest weight of the evidence.

Magnum also complains about the time T&B took to revoke acceptance.  T&B cites the difficulties it encountered in discovering the defects.  Standing alone, T&B's argument is not on point because T&B confuses the nature or cause of a defect with the existence of a defect itself.  That is to say, T&B knew very early on that press 3 was not operating correctly.  It is seemingly irrelevant that T&B was not able to isolate precisely what the problem was.  As far as section 2-608 is concerned, it is enough that a buyer knows of a problem and can therefore be expected to consider and decide upon its various courses of action.  

On the other hand, T&B raises the assurances it received from Magnum.  Technically, under section 2-608(1)(a) such assurances primarily serve as a prerequisite to revocation (or "excuse" for acceptance of nonconforming goods).  T&B argues, however, that such assurances should also inform the time for revocation under section 2-608(2).  We agree this can be taken into account.  See 810 ILCS Ann. 5/2-608, Uniform Commercial Code Comment 4, at 380  (Smith-Hurd 1993).  In the end analysis, the question is whether T&B acted in conformity with commercially acceptable standards.  It is not unreasonable to assume that a buyer may delay revocation upon the seller's assurances.  Again, we find that the trial court's judgment was not against the manifest weight of the evidence.

III. T&B'S CLAIM FOR INCIDENTAL DAMAGES

In this case, T&B received defective goods; T&B asked Magnum to repair the goods; Magnum declined; T&B hired a third party to attempt repairs; the third party's efforts were unsuccessful; T&B then revoked acceptance of the goods.  Part of T&B's counterclaim in this case includes the third party's bill.  The question therefore presented is whether the cost of unsuccessful repairs attempted prior to revocation of acceptance may be recovered as incidental damages.

Section 2-711(1)(b) of the Code provides that a buyer revoking acceptance may recover both so much of the price as has been already paid and also damages for nondelivery.  810 ILCS 5/2-711(1)(b) (West 2000).  Section 2-713(1) provides that damages for nondelivery include incidental damages.  810 ILCS 5/2-713(1) (West 2000).  Section 2-715 provides:

"Incidental damages resulting from the 

seller's breach include expenses reasonably 

incurred in inspection, receipt, transporta-

tion[,] and care and custody of goods right-

fully rejected, any commercially reasonable 

charges, expenses[,] or commissions in con-

nection with effecting cover and any other 

reasonable expense incident to the delay or 

other breach."
 810 ILCS 5/2-715(1) (West 2000).  

The incidental damages listed are not exhaustive but merely illustrative (810 ILCS Ann. 5/2-713, Uniform Commercial Code Comment 1, at 449-50  (Smith-Hurd 1993)); however, the Code does not further define "incidental."  Under one view, the costs of repair are not like the other expenses listed.  Expenses such as inspection, transportation, and the care of the goods are necessarily part of the transaction whether the transaction is ultimately successful or not.  Indeed, under some circumstances the buyer may have an affirmative duty to undertake these expenses even when the buyer is in the right.  See 810 ILCS 5/2-602, 2-603 (West 2000).  Providing for their recoupment therefore constitutes sound policy.  However, the costs of repair are not like such expenses because they are not necessarily incurred by the buyer.  The buyer always has the option of rejecting or revoking acceptance of the goods.  In other words, attempted repair is a voluntary decision, not a necessary expense.  In this case, the trial court deemed the expenses incurred by T&B necessary, stating that Magnum left T&B "no meaningful option but to have [the press] repaired by outside experts."  As we have just stated, that is not true.  T&B was free at any time to reject or revoke acceptance of the press.

Further, the case is complicated by the fact that T&B did not in fact repair the press.  Its efforts were ineffectual.  This is why T&B seeks to characterize these expenses as "incidental."  Consider: A buyer receives nonconforming goods.  The buyer pays to have the goods 
successfully
 repaired.  Aside from circumstances not plainly apparent here, such as market fluctuation, why would the buyer then return the goods nonetheless?  As a practical matter, the buyer would not.  The buyer would simply keep (accept) the goods and seek the repair costs under a variety of alternate approaches, such as a warranty theory.  The repair costs could be recouped under the general measure of warranty damages, among other theories.  See 810 ILCS 5/2-714 (West 2000).  The cases cited by T&B similarly involve recovery under warranty theories and therefore are not directly on point because they involve slightly different issues.

However, our research has revealed that in instances where revocation (or rejection) has occurred, some courts have nonetheless allowed repair costs as incidental damages under the UCC.  These cases mostly involve automobiles.  (They are, however, sparse and somewhat dated.)  Presumably many if not all contemporary warranty plaintiffs have sought their remedies under the Magnuson-Moss Warranty Federal Trade Commission Improvement Act (15 U.S.C. §§2301 through 2312 (1994)) since its passage in early 1975.  
Lloyd v. Classic Motor Coaches, Inc.
, 388 F. Supp. 785 (N.D. Ohio 1974), applying Ohio law, involves a fact pattern somewhat similar to the case at bar.  There, the plaintiff purchased a Rolls Royce automobile from the defendant.  Prior to the purchase, the car had exhibited some slight defects which the seller represented would be repaired before delivery.  Upon delivery, the car would not start.  The buyer attempted to repair the car several times.  In some instances, the seller paid for the repairs.  
Lloyd
, 388 F. Supp. at 788.  However, the car never ran properly.  Eventually a mechanic opined that it would take several thousand dollars to fix the car.  The buyer declined to have the repairs done and instead stored the car.  He then sought cancellation of the sales contract.  The court granted the cancellation and also allowed certain repair and storage charges as incidental damages.  
Lloyd
, 388 F. Supp. at 790-91; see also 
Durfee v. Rod Baxter Imports, Inc.
, 262 N.W.2d 349, 356-57 (Minn. 1978) (persistent and uncorrectable condition of automobile justified revocation of acceptance and cancellation; repair and maintenance costs allowable as incidental damages); 
Lanners v. Whitney
, 247 Or. 223, 236-37, 428 P.2d 398, 404 (1967) (rescission on contract for purchase of airplane allowed; certain repair costs granted as incidental damages).

The instant case bears some troubling difference from these other cases, however.  Notice is one important issue.  When receiving defective goods, the buyer is required to give notice at every important juncture, 
e.g.
, upon discovery of the defect, upon rejection or revocation of acceptance, 
et
 
cetera
.  In the cases we reviewed, the seller was always apprised of the buyer's actions to a greater or lesser extent.  

Thus, it would be fair to say that notice is a touchstone when defining what constitutes reasonable commercial conduct under the UCC.  Here, it does not appear that T&B gave Magnum any indication that it was seeking to hire a third party to repair the press.  The difficulty with that is compounded when considering the amount in controversy.  In the authorities we reviewed, the repair costs allowed as incidental damages were relatively modest, often only a few hundred dollars at most.  Indeed, the very term "incidental" connotes a rather narrow scope.  See 67A Am. Jur. 2d 
Sales
 §1310 (1985).  Here, however, we are considering a bill of over $11,000 for a $46,500 machine.  (And the value of the power unit alone is probably far less.)  We have not located a case where expenses of such size were allowed as incidental damages when the seller had no notice or opportunity to avoid such charges being incurred.  (For the reasons we have already explained, different issues arise in the cases where the buyer actually accepted the goods and then made repairs, sometimes exceeding the value of the goods themselves.)  Pertinent too is the buyer's duty to mitigate damages.

These considerations directly lead to consideration of another fundamental tenet of recovery, foreseeability.  As a general matter, when a seller delivers a defective product it may be reasonable for him to foresee that the buyer will make repairs.  67A Am. Jur. 2d 
Sales
 §1351, at 800 (1985).  That principle is not without its limits, however, particularly in view of the circumstances detailed above.  The question becomes the following:  without notice could Magnum have reasonably foreseen the extent of Northland's involvement?  It is unquestionable that Magnum could foresee that T&B would attempt to remove the contaminants from the power unit because that is precisely what Magnum suggested T&B do.  However, it seems fairly clear from the record that Magnum considered this to be a relatively simple process easily undertaken by one of T&B's employees and requiring a minimum of effort.  The fact that T&B never indicated otherwise might be taken as tacit agreement.  So in one sense, by retaining Northland T&B was merely following Magnum's directions.  However, from another perspective it is questionable whether Magnum, under its own power, could have anticipated T&B would incur a bill exceeding $10,000. 

In any event, we need not definitively resolve these issues today, particularly because they involve mixed questions of law and fact.  What is clear is that the trial court did not consider them, instead taking the approach that Magnum's assurances, coupled with its failure to act, left T&B no real choice in the matter.  We have already explained why that approach somewhat misses the mark.  Therefore, on remand the trial court should consider, in light of our foregoing comments, whether T&B's decision to hire Northland was a reasonable business decision and, further, whether that decision should have been anticipated by Magnum in the absence of notice.  Nothing about the foregoing discussion should be taken to suggest an answer to these questions.

Finally, we note that Northland apparently worked on power unit 2 while it was still associated with press 2.  T&B has included Northland's bill for these services as part of its incidental damages.  It is not clear that such expenses are at issue in this lawsuit, however, for T&B's complaint does not seem to be founded on the sales contract for press 2 or any warranty relating thereto.  Some additional factual or legal justification for the award of such damages might prove beneficial. 

IV. EVIDENCE OF THE REPAIRS ULTIMATELY MADE BY MAGNUM

Magnum complains that the trial court unfairly limited its consideration of the repairs Magnum alleges ultimately returned the press to proper working order.  Our resolution of the foregoing issues disposes of Magnum's complaint.  To the extent Magnum seems to argue that T&B was not justified in waiting several months before revoking acceptance, Magnum cannot complain when Magnum itself did nothing to inspect or repair the press.  To the extent that Magnum's evidence might have borne on the reasonableness of Northland's bill, that argument remains available upon remand.

V. ALLOWANCE OF PREJUDGMENT INTEREST

Finally, the points and authorities section of Magnum's brief alleges that "the buyer/defendant was not entitled to prejudgment interest pursuant to 815 ILCS 205-2 [
sic
] as amendment too late and no notice of charging such interest to the plaintiff."  Magnum has waived this point by failing to mention it further.  We therefore express no opinion on the merits, although we note in passing that the award of such interest would arguably require a finding (not present here) that T&B's deposit was withheld in an unreasonable and vexatious manner.  815 ILCS 205/2 (West 2000).

VI. CONCLUSION

The evidence was sufficient to demonstrate that the press was defective, that Magnum did not seasonably cure the defect, and that T&B properly revoked it acceptance of the press.  The judgment in favor of T&B on Magnum's claim is affirmed.  T&B is also entitled to the return of its deposit in the amount of $16,275 plus interest pursuant to statute (815 ILCS 205/2 (West 2000)).  That portion of the trial court's judgment awarding T&B incidental damages is reversed and the cause remanded for further proceedings not inconsistent with the views expressed herein.

Affirmed in part and reversed in part; cause remanded.

STEIGMANN, P.J., and KNECHT, J., concur.