PAUL F. BASSELEN *et al.*, Plaintiffs-Appellants, v. GENERAL MOTORS CORPORATION *et al.*, Defendants-Appellees.

Second District   No. 2—02—0468

Opinion filed July 1, 2003.

Sharmila Roy and Norman H. Lehrer, both of Lehrer & Canavan, P.C., of Wheaton, for appellants.

Alan W. Brothers and Ronald Austin, Jr., both of Brothers & Thompson, P.C., of Chicago, and William B. Weiler, of Swanson, Martin & Bell, of Wheaton, for appellees.

JUSTICE GROMETER delivered the opinion of the court:

Plaintiffs, Paul F. Basselen and Dena Basselen, initiated an action against defendants, General Motors Corporation (GM), Larry Roesch Chevrolet, Inc. (Roesch or dealer), and the First National Bank of Chicago (bank), in the circuit court of Du Page County. Their complaint contained the following six counts: (1) a breach of express warranty claim under the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act (Magnuson-Moss) (15 U.S.C. § 2301 *et seq.* (1994)) against GM and the dealer, (2) a claim alleging breach of an implied warranty of merchantability, also brought under Magnuson-Moss against the dealer and GM, (3) a claim against the dealer seeking revocation under state law, (4) a consumer fraud claim against the dealer (see 815 ILCS 505/1 *et seq.* (West 1994)), (5) a common-law fraud claim, which was also asserted solely against the dealer, and (6) a claim seeking rescission of the retail installment contract held by the bank. The trial court granted summary judgment in favor of Roesch on counts I, III, IV and V. At the close of plaintiffs' case, the court directed verdicts in favor of Roesch on the second count and the bank on the sixth count. The jury then returned a verdict in plaintiffs' favor and against GM for $34,034. The trial court later awarded plaintiffs $689.90 for costs, but denied their request for fees in the amount of $44,881.25.

Plaintiffs now appeal, contesting the trial court's orders granting Roesch's motions for summary judgment and directed verdicts on the bulk of their claims; however, they do not appeal the trial court's orders pertaining to their fraud claims. They also allege error in the trial court's denial of their request for attorney fees. For the reasons that follow, we affirm in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

Plaintiffs purchased a 1996 Chevrolet conversion van from Roesch on September 17, 1996. GM provided a 3-year or 36,000-mile warranty. Roesch purportedly disclaimed all warranties, express or implied. Soon after the purchase, plaintiffs began experiencing problems with the vehicle. On April 3, 1997, plaintiffs brought the van to King Chevrolet (King) because the service-engine-soon light had come on. King, an authorized GM dealer, serviced the van pursuant to the warranty. On April 21, 1997, plaintiffs again took the van to King, as the service-engine-soon light had again come on. Subsequently, the light came on again, and plaintiffs took the vehicle back to King on May 5, 1997. About three weeks later, the light activated again. Plaintiffs contacted King and were told that there was nothing more King could do. Someone at King advised plaintiffs to take the van to the original dealer that sold them the vehicle.

Two to three weeks later, plaintiffs contacted Roesch. Plaintiffs complained of problems with the electrical system and the brakes. The service-engine-soon light was on. They stated that a sofa bed in the back of the vehicle had come loose and would move back and forth. There were also acceleration and stalling problems. Outside of the brakes, the vehicle was still covered by the GM warranty at this time. The majority of these problems were never corrected. The sofa bed was welded back in place; however, Mr. Basselen, who is familiar with welding from his job, testified that the welds were inadequate and that the carpeting and the sofa were burned. The brakes were repaired by Midas at plaintiffs' expense; however, the van still pulled to one side when the brakes were applied.

Additionally, the tires on the van were wearing from one side only. Plaintiffs took the van to Huntley Automotive and replaced the tires. This cost plaintiffs $121.31. Huntley also repaired the front brakes on June 11, 1998.

Mr. Basselen testified that he began complaining to Roesch and GM shortly after he purchased the van. He complained to Roesch numerous times, with the last time being shortly before he stopped driving it. In August 1997 or September 1997, plaintiffs decided they

no longer wanted the van. Mr. Basselen told a service manager at Roesch that if Roesch could not fix the van, it should keep the van and give plaintiffs a new one. The manager told him that Roesch would not do that. At this time, the van had 23,000 miles on it, and plaintiffs drove it at least an additional 19,000 miles thereafter. Plaintiffs ceased making payments on the van. Plaintiffs hired an attorney, and the attorney sent Roesch a letter on January 14, 1998, seeking revocation of their acceptance of the van and damages. Defendants denied this request, and the instant action subsequently ensued.

## II. ANALYSIS

The issues raised by plaintiffs in this appeal fall into three main areas. Plaintiffs first take issue with the trial court's decision to grant summary judgment in favor of Roesch on the revocation count of their complaint. Next, plaintiffs complain of the trial court's grant of a directed verdict in favor of Roesch on the count alleging breach of an implied warranty of merchantability. Finally, they attack the trial court's denial of their request for attorney fees. We will consider these issues in turn.

### A. Revocation

■ In order to be entitled to revoke acceptance of goods, a buyer must show the following: (1) a nonconformity in the goods that substantially impairs the value of the goods to the buyer, (2) acceptance was made on the reasonable assumption that the defect would be cured or because the acceptance was made without knowledge of the defect due to either the difficulty of discovering the defect or the seller's assurances, (3) revocation was made within a reasonable time after the nonconformity was or should have been discovered, (4) revocation occurred before a substantial change in the goods took place not caused by their own defects, and (5) the buyer gave the seller due notification. 810 ILCS 5/2—608 (West 1996). The trial court found that plaintiffs had not satisfied the fourth element. It first noted that vehicles like cars and passenger vans are highly depreciable and that they depreciate both with use and time. It then observed that, at the time plaintiffs first sought to revoke, the van had been driven for 23,000 miles. The court also relied on the fact that there were some dents and scratches on the van. We find the reasoning of the trial court sound.

■ Because this issue comes to us following a grant of summary judgment, we conduct *de novo* review. *Corona v. Malm*, 315 Ill. App. 3d 692, 694 (2000). The record must be construed liberally in favor of the party opposing the motion and strictly against the movant. *Largosa v. Ford Motor Co.*, 303 Ill. App. 3d 751, 753 (1999). Although the

nonmovant need not prove his or her case at this stage, he or she must present some facts that would arguably entitle him or her to judgment. *Sunderman v. Agarwal*, 322 Ill. App. 3d 900, 902 (2001). In the present case, we conclude that plaintiffs have not sustained their burden of producing some facts that would enable a jury to conclude that their continued and extensive use of the van was reasonable.

We note that, at times, the parties conflate the issue of whether the revocation was timely with the issue of whether it occurred prior to a substantial change in the condition of the goods. These questions are distinct. A buyer who totals a vehicle as he drives it off the seller's lot could issue a timely revocation by immediately running back to the dealership; however, the condition of the car would have surely changed substantially. Conversely, a buyer who purchases a car, hermetically seals it, and stores it for 20 years may be in possession of a vehicle that has not changed substantially; nevertheless, any attempted revocation would be untimely.

■ Generally speaking, following revocation, a buyer must preserve the goods for the seller. See *Valentino v. Glendale Nissan, Inc.*, 317 Ill. App. 3d 524, 530 (2000). A buyer who continues to use goods of which acceptance has purportedly been revoked "could face the prospect of nullifying [the] revocation." *Valentino*, 317 Ill. App. 3d at 530. Exceptions exist; thus, the continued use of goods will not, in all circumstances, bar revocation. For example, where ceasing use of the goods would cause undue hardship to the buyer, continued use may not preclude revocation. See *Gasque v. Mooers Motor Car Co.*, 227 Va. 154, 162, 313 S.E.2d 384, 389 (1984) ("Exceptions have been made to the rule in mobile home cases, where departure from the home before resolving the litigation would cause undue hardship to the buyer and where the buyer's continued occupancy might be the best means of safeguarding the property for a seller who refuses to take it back"). Moreover, in certain circumstances not applicable here, a buyer may continue to use the goods if such use is commercially reasonable. See *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 986-87 (1980). In all cases, the inquiry turns on whether a buyer's postrevocation use of goods is reasonable under the circumstances. See *Alden Press, Inc. v. Block & Co.*, 173 Ill. App. 3d 251, 262-63 (1988), quoting *Johannsen v. Minnesota Valley Ford Tractor Co.*, 304 N.W.2d 654, 658 (Minn. 1981), and *Fablok Mills, Inc. v. Cocker Machine & Foundry Co.*, 125 N.J. Super. 251, 257-58, 310 A.2d 491, 494-95 (1973). The plaintiff bears the burden of proving that postrevocation use was reasonable. *Gray v. Davis*, 45 Ill. App. 3d 55, 56-57 (1977).

Plaintiffs assert that reasonableness is a question of fact. This

proposition is generally true. See *Magnum Press Automation, Inc. v. Thomas & Betts Corp.*, 325 Ill. App. 3d 613, 618-19 (2001). However, beyond this bare assertion, plaintiffs point to no facts that would support the proposition that their use was reasonable. Obviously, for an issue of fact to exist, there must be some facts in the record that would allow plaintiffs to prevail. Absent some explanation for their continued use of the van, we hold that it bars revocation as a matter of law.

In fact, several of the cases upon which plaintiffs rely plainly demonstrate this principle. In *Alden Press*, the court held that a buyer's use of a portion of a lot of defective catalogues did not constitute acceptance of the whole lot. While *Alden Press*, 173 Ill. App. 3d at 263-64, is a rejection rather than revocation case, it is sufficiently analogous to provide some guidance here. Applying a standard of reasonableness, the court concluded that the buyer sufficiently raised the issue of whether its use of the catalogues was reasonable where it presented evidence that it could not acquire substitute catalogues by a set mailing date and the failure to mail the catalogues by that time would result in financial disaster. *Alden Press*, 173 Ill. App. 3d at 263-64.

Similarly, in *Frank's Maintenance & Engineering*, 86 Ill. App. 3d at 986-87, the court held that the fact that the buyer scrapped a load of defective steel did not necessarily preclude revocation. The buyer introduced evidence that it was a small plant with limited storage space, that it feared the defective steel might become intermingled with good steel, and that it did not scrap the steel until another load of steel was due to be delivered. *Frank's Maintenance & Engineering*, 86 Ill. App. 3d at 984.

■ In the present case, plaintiffs point to no comparable evidence. Plaintiffs do not suggest that, without the van, they lacked necessary transportation. In fact, during the same transaction in which the van was purchased, plaintiffs also purchased a truck. They do not state that they could not have purchased or otherwise acquired another vehicle, although they do state that they could not have traded the van in because of a peculiar financing arrangement employed in the transaction. In short, they provide no basis for concluding that their use was reasonable under the circumstances.

Thus, we are left to consider whether driving a vehicle 23,000 miles prior to an attempted revocation, and at least an additional 19,000 miles after the first attempt at revocation, without explanation for the need for this use, bars revocation as a matter of law. We hold that it does. See *Alden Press*, 173 Ill. App. 3d at 264 (distinguishing *Brule C.E.& E., Inc. v. Pronto Foods Corp.*, 3 Ill. App. 3d 135 (1971),

on the basis that in *Brule,* "no facts were adduced showing, nor was any argument made therein, that the buyer's use of the goods was reasonable under the circumstances"). Although no Illinois court has addressed this precise issue, we find considerable guidance from other jurisdictions.

The Supreme Court of Virginia confronted an analogous situation in *Gasque.* In that case, the plaintiffs attempted to revoke acceptance of an automobile approximately seven months after they purchased it. Shortly after taking possession of it, they discovered numerous defects, and the dealer from whom they bought the car made several attempts at repair, which were only partially successful. At the time of the attempted revocation, plaintiffs had driven the car 5,400 miles, and after the attempted revocation they drove it an additional 2,600 miles before parking it permanently. The court held that, while the plaintiffs' attempt was not untimely in light of the dealer's attempts to fix the car, revocation was not possible due to the plaintiffs' continued use of the vehicle. *Gasque,* 227 Va. at 162, 313 S.E.2d at 389. With the exception of the total miles driven, the facts of *Gasque* are identical to those in the present case. Here, plaintiffs had driven the car 23,000 miles at the time they first attempted to revoke and ultimately drove it at least 42,000 miles.

In *Bryant v. Prenger,* 717 S.W.2d 242, 244-45 (Mo. App. 1986), a Missouri court held that revocation was not possible where the plaintiffs drove a car about 12,000 miles after attempting revocation. The *Bryant* court observed that "after [the plaintiffs] undertook to revoke their acceptance of the car they used it for their own purposes and convenience adding at least 12,000 miles of additional operation." *Bryant,* 717 S.W.2d at 244. It went on to state:

"The buyer cannot continue to use the goods as his own and still have the benefit of rescission. If, after a proper rejection and rescission, the buyer then uses the goods as his own and in a manner inconsistent with the rights of the seller, such use nullifies the rescission." *Bryant,* 717 S.W.2d at 244.

In the present case, plaintiffs not only drove the van 23,000 miles prior to revocation, they drove it at least another 19,000 after they sought to disclaim their ownership of it through revocation. Absent some explanation, plaintiffs' continued and extensive use of the vehicle was unreasonable. Like the *Bryant* court, we hold that this use made revocation impossible.

Plaintiffs rely on *Smith v. Navistar International Transportation Corp.,* 714 F. Supp. 303, 309 (N.D. Ill. 1989), where the court found that the fact that a semi-tractor truck had been driven for over 48,000 miles did not preclude revocation as a matter of law. We find *Smith*

distinguishable. It involved a large commercial vehicle designed for long-distance, over-the-road use. The instant case involves a passenger vehicle designed for personal use. The amount of use that would preclude revocation regarding the former is obviously much more than would be sufficient to bar revocation regarding the latter.

Finally, we will briefly address plaintiffs' argument that revocation is still possible so long as Roesch receives an offset to account for plaintiffs' continued use of the van. In support of this argument, plaintiffs rely on *Valentino*, in which the court stated, "If [the plaintiff] used the car for any other reason than preservation after she revoked her acceptance, [the] plaintiff would have to reimburse [the] defendant with a reasonable sum commensurate with the amount of her usage, including any depreciation in value resulting therefrom." *Valentino*, 317 Ill. App. 3d at 530. In the very next sentence, however, the *Valentino* court noted that, "[i]n addition, [the] plaintiff could face the prospect of nullifying her revocation." *Valentino*, 317 Ill. App. 3d at 530. We read this passage as reflecting the fact that a buyer may, when it is reasonable to do so, continue to use goods. Under such circumstances, the buyer must compensate the seller for the continuing use. However, as in the present case, where the continuing use is not reasonable, revocation is not possible and the question of offset does not arise.

In conclusion, we note that plaintiffs were not left without a remedy. Though they were barred from revoking their purchase, they were able to pursue, ultimately successfully, a warranty claim. Given their extensive use of the vehicle, the trial court properly limited plaintiffs to this remedy. Accordingly, we affirm the trial court's grant of summary judgment on the revocation count of plaintiffs' complaint.

## B. Implied Warranty of Merchantability

■ Regarding the warranty claims, plaintiffs prevailed only against GM. The trial court directed a verdict in Roesch's favor because it concluded that Roesch had effectively disclaimed all warranties. Plaintiffs advance three arguments as to why the trial court erred. First, they claim that Roesch should not have been allowed to rely on the disclaimers because it did not plead them as an affirmative defense. Second, plaintiffs contend that the trial court utilized an improper standard in assessing whether the disclaimers were unconscionable. Third, they assert that the disclaimers were ineffective because they were inconspicuous. We find none of these arguments persuasive. A court may direct a verdict where the evidence, viewed in the light most favorable to the nonmovant, so favors the movant that no contrary verdict could stand. *Alvarez v. American Isuzu Motors*, 321

Ill. App. 3d 696, 702 (2001). We review *de novo* a trial court's decision to direct a verdict. *Alvarez*, 321 Ill. App. 3d at 702.

■ First, we find it doubtful that a disclaimer constitutes an affirmative defense. An affirmative defense is one that "gives color to the opposing party's claim and then asserts new matter by which the apparent right is defeated." *Vanlandingham v. Ivanow*, 246 Ill. App. 3d 348, 357 (1993). Regarding an implied warranty of merchantability, the Uniform Commercial Code (Code) states, *"Unless excluded or modified* (Section 2—316), a warranty that the goods shall be merchantable is implied in a contract for their sale \*\*\*."* (Emphasis added.) 810 ILCS 5/2—314 (West 1996). As the emphasized language indicates, where a seller excludes a warranty, one is not implied in the first place. Hence, by relying on a disclaimer, Roesch is not admitting that a warranty exists and seeking to avoid its effect. Rather, Roesch is arguing that a warranty did not arise. Roesch's argument does not fall within the definition of an affirmative defense; therefore, it did not need to be pleaded.

Moreover, the "failure to plead an affirmative defense in the initial answer is not necessarily a waiver." *Rognant v. Palacios*, 224 Ill. App. 3d 418, 422 (1991). In fact, a trial court may, in its discretion, allow a defendant to raise affirmative matter anytime prior to final judgment. *Behr v. Club Med, Inc.*, 190 Ill. App. 3d 396, 407 (1989). This decision rests largely on whether the opposing party is prejudiced, and "[c]ases where prejudice has been found most often concern amendments made during or immediately before trial or where it is too late for the opposing party to adequately respond to the amendment." *People ex rel. Foreman v. Village of Round Lake Park*, 171 Ill. App. 3d 443, 448 (1988). In the instant case, Roesch raised the disclaimer issue in a motion for summary judgment, and plaintiffs' response to this motion included extensive briefing of this issue. Thus, plaintiffs were well aware of Roesch's intent to rely upon the disclaimers, and they suffered no prejudice at trial when the trial court allowed Roesch to do so. See *Rognant*, 224 Ill. App. 3d at 422 ("In the case *sub judice*, plaintiff had adequate time to respond to defendant's assertion of the statute of limitations. It was pled properly in defendant's motion for summary judgment [citation], and plaintiff addressed it in her reply. No waiver can be said to have occurred"). Thus, assuming, *arguendo*, that a disclaimer is an affirmative defense, we find no error here.

Plaintiffs assert that they were prejudiced by Roesch's failure to plead the disclaimers because it prevented them from seeking a hearing regarding the disclaimers' conscionability prior to trial (see 810 ILCS 5/2—302(2) (West 1996)). However, plaintiffs were afforded an evidentiary hearing during the trial and outside the presence of the

jury in which they were permitted to attack the disclaimers' conscionability. Plaintiffs make the assertion that the result might have been different had a hearing been held before trial but do not explain why this is so. They also suggest judicial bias, claiming that the result of the hearing "was already a foregone conclusion," but do not point to anything to substantiate this accusation. Given plaintiffs' failure to support these allegations, we cannot conclude that they were prejudiced due to the fact that the hearing on unconscionability was not held prior to trial. Moreover, as we will explain in addressing plaintiffs' next argument, plaintiffs have not made out a *prima facie* case of unconscionablity, so it is difficult to see how the result would have changed had the hearing been held earlier.

■ Plaintiffs' second argument is that the trial court applied an improper standard in assessing whether the disclaimers were unconscionable. We agree. The trial court stated that "[a]n unconscionable provision in a contract is one which shocks the conscience." Unconscionability has two aspects, which it is useful to think of as procedural and substantive. On the procedural side, the question is, how did the provision make its way into the contract? Considerations such as unfair surprise and the relative bargaining strength of the parties are relevant here. See *J.D. Pavlak, Ltd. v. William Davies Co.*, 40 Ill. App. 3d 1, 4 (1976). On the substantive side, the question is whether the terms of the contract are grossly one-sided. *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 191 (1983) ("A contract is unconscionable when it is improvident, oppressive, or totally one-sided").

Both elements of unconscionability must be met before a contract or clause will not be enforced. Obviously, if a defendant fraudulently inserts into a contract a clause that is beneficial to a plaintiff, the plaintiff has not been harmed and there is no need to strike the clause. On the other hand, if a plaintiff knowingly and freely assents to a clause that works a substantial disadvantage against the plaintiff, he or she cannot be later heard to complain of the clause. The plaintiff has simply made a bad deal. Thus, unless both the clause has made its way into a contract in some untoward manner and the clause works some substantial detriment to the opposing party, the clause is not unconscionable and will be enforced.

■ In the present case, plaintiffs address only the procedural side of unconscionability. They assert that the disclaimers were not shown to them until after they signed the retail installment contract. Assuming that this satisfies the procedural aspects of unconscionability by showing that the disclaimers made their way into the contract in some untoward fashion, plaintiffs have not made any attempt to demonstrate

that the disclaimers were unconscionable in a substantive sense. We doubt that they could make such a showing given the particular aspects of the transaction at issue. Quite simply, the van was warranted by GM, and, as noted above, plaintiffs ultimately recovered $34,034 by virtue of this warranty. We fail to see how the fact that plaintiffs had one warranty instead of two resulted in a transaction that was so oppressive and one-sided that it could be called unconscionable.

In light of plaintiffs' failure to explain how they were prejudiced in a substantive sense, we are forced to conclude that any error on the trial court's behalf in assessing their claim of unconscionability was harmless. Regardless of the standard the trial court applied, plaintiffs have not made out a *prima facie* case of unconscionability.

■ Plaintiffs next contend that the trial court erred by giving effect to disclaimers that were inconspicuous. In order to effectively disclaim an implied warranty of merchantability, the disclaimer must be conspicuous. 810 ILCS 5/2—316(2) (West 1996). The Code defines "conspicuous" as follows:

> "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals *** is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color." 810 ILCS 5/1—201(10) (West 1996).

See also *Bowers Manufacturing Co. v. Chicago Machine Tool Co.*, 117 Ill. App. 3d 226, 233-34 (1983). The Code also provides guidance as to the content of an effective disclaimer. Section 2—316 states that "all implied warranties are excluded by expressions like 'as is,' 'with all faults,' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." 810 ILCS 5/2—316(3)(a) (West 1996). Whether a disclaimer is conspicuous is a question of law, which we review *de novo. Carpenter v. Mobile World, Inc.*, 194 Ill. App. 3d 830, 837 (1990).

■ We have reviewed a document entitled the "new buyer's order" form. It appears to us that this document contained a disclaimer that is sufficiently conspicuous to be effective. Slightly more than halfway down the form the words "New Car Factory Limited Warranty—As Is" appear. They are in all capital letters and are also in a larger font than most of the rest of the words on the form. They are followed by some small print through which Roesch attempts to disclaim all warranties. However, even if we assume this smaller print is ineffective and disregard it, "as is" appears in

conspicuous print in the middle of the form. "As is" is sufficient to disclaim an implied warranty of merchantability (810 ILCS 5/2—316(3)(a) (West 1996)), and its prominent placement in the document is fatal to plaintiffs' argument.

Accordingly, we reject all three of plaintiffs' arguments on the warranty issue. We therefore affirm the decision of the trial court directing a verdict in favor of Roesch.

## C. Attorney Fees

■ Plaintiffs' final contention is that the trial court erred in denying their request for attorney fees. Plaintiffs' request is based on the fee-shifting provisions of Magnuson-Moss. See 15 U.S.C. § 2310(d)(2) (1994). An award of fees under Magnuson-Moss is reviewed using the abuse-of-discretion standard. *Skelton v. General Motors Corp.*, 860 F.2d 250, 257 (7th Cir. 1988). However, a court of review will overturn a fee award where it is based on an error of law. *Skelton*, 860 F.2d at 257. Although we agree largely with the decision of the trial court, we conclude that the method employed by the trial court in assessing plaintiffs' request was improper. We note that defendants stipulated that the rate charged by plaintiffs' attorney is reasonable and that the amount of hours spent on the case was reasonable as well.

The crux of the dispute between the parties turns on whether plaintiffs are entitled to recover fees for work expended on the revocation and rescission counts as well as the Magnuson-Moss counts (as they assert), or whether they are limited to compensation for work performed on the Magnuson-Moss counts themselves (as defendants contend). The trial court found that plaintiffs failed to document the time their attorney spent working on the case in a manner that would allow the court to ascertain the nature of the work being performed, as represented by the various entries. Plaintiffs contend that all hours spent after the fraud counts were removed from the case were sufficiently related to the Magnuson-Moss counts such that they were entitled to compensation for all of this work. In other words, according to plaintiffs, their sloppy documentation did not matter after the fraud counts were eliminated.

We agree generally with plaintiffs' basic contention that hours sufficiently related to the Magnuson-Moss counts are compensable even though the work pertained to other counts of the complaint. Because plaintiffs request fees pursuant to a federal statute, federal law is relevant to resolving this issue. *Cabrera v. First National Bank of Wheaton*, 324 Ill. App. 3d 85, 92 (2001); *Weiss v. Village of Downers Grove*, 225 Ill. App. 3d 466, 469 (1992) ("Where, as here, a State court

considers a Federal claim under the supremacy clause of the United States Constitution (U.S. Const., art. VI), the State court must apply Federal law to the claim"). Thus, we will look to federal case law to ascertain whether plaintiffs' claim is well founded.

In *Hensley v. Eckerhart*, 461 U.S. 424, 434-35, 76 L. Ed. 2d 40, 51-52, 103 S. Ct. 1933, 1940 (1983), the Supreme Court made the following observation:

> "In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case—counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.' [Citation.] The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

> It may well be that cases involving such unrelated claims are unlikely to arise with great frequency. Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."

Thus, the Supreme Court drew a distinction between related and unrelated claims brought in a single suit. Where claims are sufficiently related, that is, they arise out of a common core of facts, work typically will be directed to the case as a whole. In such circumstances, it is not necessary to delineate time spent on various claims, for the work advances the suit as a whole. However, where work is spent pursuing unsuccessful claims that are unrelated to the claim on which a fee award is sought, that work is not compensable. *Jaffee v. Redmond*, 142 F.3d 409, 413 (7th Cir. 1998). In such cases, it is necessary to delineate how much time is devoted to each claim.

We therefore agree with plaintiffs that time spent on claims sufficiently related to the Magnuson-Moss claims is compensable. We have little problem accepting plaintiffs' contention that the revocation claim based on state law is sufficiently related to the warranty claims

brought under Magnuson-Moss. This, however, does not end the analysis.

Plaintiffs agree that the fraud claims are not sufficiently related to the Magnuson-Moss claims and that they are not entitled to recover for work spent on them. Plaintiffs assert that, once the trial court granted summary judgment on the fraud claims, all subsequent work was related to the Magnuson-Moss claims. With this proposition, we disagree. Initially, we note that plaintiffs raised the trial court's ruling on the fraud counts in their posttrial motion, albeit briefly. While time spent raising this issue in the posttrial motion was likely minimal, it is unrelated to the Magnuson-Moss claims and plaintiffs are not entitled to recover attorney fees for it. Furthermore, we do not believe that all work expended on count VI of the complaint, which sought rescission of the retail installment contract against the bank, was related to the Magnuson-Moss counts. In order to prove this count, plaintiffs had to prove an assignment, which is clearly not related to anything plaintiffs had to prove to prevail on their Magnuson-Moss claims. Moreover, this claim relied on a Federal Trade Commission rule, the application of which is unrelated to the substance of Magnuson-Moss. See 16 C.F.R. § 433.2 (2003). Again, while this issue probably took little time in comparison with time spent on the rest of the case, defendants are not required to compensate plaintiffs for this sort of work. Thus, we conclude that plaintiffs are not automatically entitled to be compensated for all time spent after the trial court granted summary judgment on the fraud claims.

We therefore agree with the trial court that the documentation submitted by plaintiffs in support of their request for attorney fees is largely inadequate. Portions of the document border on illegible. Other entries contain insufficient information to determine what sort of work plaintiffs' counsel was performing. For example, the notation "Ct App" appears repeatedly. Presumably, this stands for "court appearance." It is impossible to determine what the purpose of the court appearance was. Other entries, however, do document work that is compensable. For example, the document contains an entry that states "Rev. Fed. Cases—Mag-Moss." Obviously, this entry refers to legal research performed on Magnuson-Moss itself.

Our reading of the trial court's denial of plaintiffs' fee petition indicates to us that the trial court considered and rejected the petition as a whole. Proceeding in this manner was improper. In *Hatfield v. Oak Hill Banks*, 222 F. Supp. 2d 988, 993 (S.D. Ohio 2002), a Magnuson-Moss case, the court stated, "Accordingly, the Court will review the *hours* recorded by [the] Plaintiffs' counsel, and will determine whether any *time* should be excluded as relating only to the

claims against Defendant Oak Hill." (Emphasis added.) Thus, the court eschewed an approach whereby it would look at the claims as a whole and instead focused on the type of work actually performed during the various times for which compensation was claimed. This approach is particularly appropriate where claims are interrelated and some work may be related to the case as a whole, other work to a compensable claim, and yet other work to a claim for which fees cannot be recovered. We believe considering each entry in itself, rather than in the context of a particular claim or a petition as a whole, "is more in tune with the realities of litigation." *Jaffee*, 142 F.3d at 414. Thus, we hold that the trial court erred in rejecting plaintiffs' petition as a whole without giving consideration to the individual entries therein, some of which are clearly compensable. This cause must be remanded so that the trial court can consider plaintiffs' petition properly.

Before closing, we must address plaintiffs' reliance on *Ciampi v. Ogden Chrysler Plymouth, Inc.*, 262 Ill. App. 3d 94 (1994). In that case, this court permitted a plaintiff to recover attorney fees under the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/10(a) (West 1998)) and let stand an award of fees that included time spent litigating against the holder of a note. That case is distinguishable because the award of attorney fees was based on a state statute rather than a federal statute. Moreover, we reject the *Ciampi* decision insofar as it implies that a plaintiff may recover attorney fees for time spent on a matter that does not relate to a claim for which attorney fees are recoverable.

## III. CONCLUSION

In light of the foregoing, we vacate the order of the circuit court of Du Page County denying plaintiffs' petition for attorney fees and remand this cause for further proceedings consistent with the views expressed herein. In all other aspects we affirm.

Affirmed in part and vacated in part; cause remanded with directions.

BYRNE and GILLERAN JOHNSON, JJ., concur.