# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-1871

SUTTER INSURANCE COMPANY,

*Plaintiff-Appellant,*

*v.*

APPLIED SYSTEMS, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 5849—**Matthew F. Kennelly**, *Judge.*

_____

ARGUED DECEMBER 2, 2004—DECIDED DECEMBER 28, 2004

_____

Before BAUER, POSNER, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* This is a diversity suit, governed by Illinois law, for breach of contract. (Certain other claims have dropped out.) The plaintiff, Sutter, is an insurance company that purchased the "Diamond System," a computer software program, from the defendant, Applied, which designs and sells business applications software. Sutter had to replace its existing software because the provider had announced that it would soon cease providing updates. The district judge, after a bench trial, rejected Sutter's claims but also Applied's counterclaim; only Sutter has appealed.

The contract, which was signed and took effect in March of 2000, provides for the sale by Applied of "the Software and Services as specified in the attached Schedule 'A'." Schedule A, captioned "Diamond Base System Features and Functions," describes the features of the Diamond System and indicates that it supports a variety of lines of insurance business, including home, auto, and umbrella, and that it handles billing and accounting, including agency billing (i.e., billing the insurance premium to an insurance agent rather than to the insured directly), although a headnote to the schedule warns that "based upon each company's specifications and implementation plans, all listed features, and functions may not be implemented." By "company's" is meant "customer's" because the contract defines "company" to mean the customer, not Applied.

Schedule F of the contract specifies three prices: $300,000 for the Diamond Base System, $35,000 for "Line of Business Fee," and $25,000 for "State Fee." The term "line of business" refers to a line of insurance business, such as "Commercial Auto," "Vehicle Service Contracts," and "Dwelling Fire." Sutter sells 28 lines. The "state fee" is a fee for adapting the Diamond Base System to the insurance regulatory environment of a given state, such as California, where Sutter does most of its business, though it sells in three other states as well. The $60,000 in fees over and above the $300,000 for the base system were thus fees for tailoring the Diamond System to a single line of business in a single state.

Schedule F specifies that the line to which the Diamond Base System is to be tailored is Preferred Homeowner and the state is California. The total price of $360,000 is to be paid when the Diamond System, adapted to the California Preferred Homeowner line, is delivered to Sutter. But the delivery must "includ[e] the minimum functionality indicated as 'necessary to go live' on Schedule 'A.'" "Go live"

means placing the system in operation, though there might still be bugs to work out, for the contract warns Sutter that "in the design and development of complex computer software systems limited system defects or errors may be expected." (No kidding!)

The California Preferred Homeowner line was a new line and one for which Sutter bills directly rather than through insurance agents. After some hitches, the application of the Diamond System to that line "went live," and at that point Sutter had to complete payment of the $360,000 specified in the contract, and it did so. But the California Preferred Homeowner line is only a tiny part of Sutter's business, for remember that Sutter sells 28 lines in four states, and it uses agency rather than direct billing in 26 of its 27 other lines in all four states. So with the software for the California Preferred Homeowner line up and running, the parties immediately turned to the other lines (the "Tier I" lines, they called them). Unfortunately, Applied proved unable to adapt the Diamond System to agency billing, which meant that Sutter had to find another vendor. So, Sutter announced that it was canceling the contract, though it said it would continue to use the Diamond software on the California Preferred Homeowner line until the existing policies expired, because it had no other software that could handle that line of business. It was, as we said, a new line, and Sutter's previous provider had not served it and could not do so. Applied, perhaps contrite, did not object.

A provision of the contract that we have not yet mentioned states that after acceptance of delivery Sutter may no longer revoke the contract without Applied's consent. This scotches Sutter's alternative argument—alternative to the argument that Applied broke the contract—that Sutter rightfully revoked the contract when Applied proved unable to adapt the Diamond System to agency billing and is there-

fore entitled to the return of the $360,000 irrespective of whether Applied broke the contract in failing to adapt the Diamond System to Sutter's other lines of business. Cf. *Roach v. Concord Boat Corp.*, 880 S.W.2d 305, 308 (Ark. 1994); *General Motors Acceptance Corp. v. Anaya*, 703 P.2d 169, 171 (N. Mex. 1985); *Baker v. Wade*, 949 S.W.2d 199, 201 (Mo. App. 1997). As we have just seen, the contract forbade revocation at will. It did not foreclose Sutter from terminating the contract if Applied failed to honor its terms. *Basselen v. General Motors Corp.*, 792 N.E.2d 498, 505-06 (Ill. App. 2003); cf. *Barry & Sewall Industrial Supply Co. v. Metal-Prep of Houston, Inc.*, 912 F.2d 252, 257 (8th Cir. 1990). But that is the breach of contract issue, and has nothing to do with revocation rights.

Let us turn, then, to the contract issue. Sutter paid Applied a total of $492,811—$360,000 for the Diamond System and $132,811 for servicing and maintaining the system. It claims these as damages and also claims to have incurred some incidental damages as a result of having to obtain an alternative system (consisting in fact of updates to its existing system) to handle agency billing for its other lines of business. The district judge ruled that Applied's inability to adapt the Diamond System to agency billing was not a breach of contract, and so Sutter was out of luck and must swallow its entire loss. But he also rejected Applied's counterclaim, which sought recovery of the expense that Applied had incurred in its futile efforts on the Tier I lines. The judge found that Applied's work on those lines "did not conform to the specifications 'stated in Schedule A,' as the [contract] required." "Specifically, they did not meet Schedule A's representations regarding agency billing and related functions. . . .[T]hese specifications, reasonably construed, communicated to Sutter that the software would conform to its agency billing reconciliation needs. The

software failed to do so, and it was not capable of doing so without further work for which Applied proposed to bill Sutter."

There appears to be an inconsistency in the district judge's opinion. It says on the one hand that Applied's inability to furnish Sutter with software capable of handling agency billing was not a breach of contract, but on the other hand that Applied's unsuccessful efforts to furnish such software did not conform to the specifications in Schedule A. (Those "specifications, reasonably construed, communicated to Sutter that the software would conform to its agency billing reconciliation needs. The software failed to do so.") That sounds like a breach of contract by Applied, since Schedule A was of course part of the contract, though the judge may simply have meant that even if Sutter could not terminate the contract merely because Applied was unable to furnish software for any line of business except the Preferred Homeowner line, Applied had no right to an additional $35,000 fee for providing software that didn't work.

Applied—ignoring Schedule A—interprets the contract to mean that Sutter's only entitlement is, at a price of $360,000, for software for one line of business in one state. The first line Sutter selected was the Preferred Homeowner line and once the software for that line was up and running, Sutter had to pay $360,000 to Applied and Applied had no further obligations to Sutter. The judge's ruling on the counter-claim, quoted above, is difficult to reconcile with such an interpretation.

In nevertheless ruling for Applied on the main claim, the judge did not explain how Applied's interpretation could be squared with either the language of Schedule A or the extrinsic evidence that had been placed in evidence at the trial without objection (though why there was no objection is unclear, since the contract contains an integration clause)

in order to help guide interpretation of the contract. That evidence included testimony that Sutter had made clear to Applied during the negotiations leading up to the signing of the contract its desire to convert *all* its lines of business to the Diamond System—and remember that Schedule A specifies agency billing as one of the capabilities of the system. It is true that Schedule A warns that some of these capabilities "may not be implemented" because of the customer's "specifications and implementation plan," but the evidence indicates that the impossibility of implementing the other lines had nothing to do with Sutter's "specifications and implementation plan." It had rather to do with the fact that, as an internal communication of Applied states, "we [Applied] do not have a lot of experience with [agency billing]." A later such communication states: "This should be a learning experience [for us]." (Learning at Sutter's expense!) And then there is Applied's inability to furnish working software for the Tier I lines—Applied's failure, the judge found, not Sutter's.

It is also true that the contract warns of "*limited* system defects or errors" (emphasis added). The apparent reference is to the usual bugs that afflict a software program, bugs that might take a long time to work out. But the district judge's ruling on the counterclaim indicates, as we have just noted, that Applied was incapable of adapting the Diamond System to agency billing, rather than that its software for doing so had bugs that could eventually be eliminated.

Another reason to doubt Applied's interpretation of the contract is that it would not make sense for Sutter to pay $360,000 for software good for only a minor line of business (the Preferred Homeowner line accounted for only 1 percent of Sutter's total business) and in a single state (albeit its most important state). The two-part price—a fixed price of $300,000 plus a price that varied with the number of lines of

business—was an invitation to Sutter to order software for additional lines beyond the first in order to spread the fixed base fee over more lines and so reduce Sutter's average cost of billing insurance premiums. The implication was that Sutter could in fact obtain from Applied the additional software specified in Schedule A, and thus reduce its average cost. If Sutter had to obtain software from a different company for agency billing, moreover, it might have to pay another stiff flat fee and anyway the added burden on its computer staff would be great. These considerations support an inference that Applied was committing itself to adapt the Diamond System to all of Sutter's lines, provided that Sutter itself didn't, by its specifications or implementation plans, prevent Applied from doing the necessary adapting at reasonable cost.

Aware of these points, the district judge remarked: "This was not a particularly sensible contract for Sutter to sign." Yet at the same time he described Sutter correctly as a commercially sophisticated enterprise. What is more, Sutter was an experienced user of computer software for agency billing. It is nevertheless *possible* that it bought a pig in a poke for $360,000—a piece of software that, usable only for Sutter's smallest line of business, was absurdly overpriced. But how plausible is the suggestion? Commercial reasonableness is a useful guide to the interpretation of an ambiguous contract. *Fox v. Commercial Coin Laundry Systems*, 757 N.E.2d 529, 532 (Ill. App. 2001); *Chicago Title & Trust Co. v. Telco Capital Corp.*, 685 N.E.2d 952, 955-56 (Ill. App. 1997); *NutraSweet Co. v. American Nat'l Bank & Trust Co. of Chicago*, 635 N.E.2d 440, 444-45 (Ill. App. 1994); *Utica Mutual Ins. Co. v. Vigo Coal Co.*, No. 04-1015, 2004 WL 2930973, at *3 (7th Cir. Dec. 20, 2004); *Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, No. 04-1617, 2004 WL 2904311, at *2-4 (7th Cir. Dec. 16, 2004); *National Tax Institute, Inc. v. Topnotch at Stowe Resort*

*& Spa*, 388 F.3d 15, 19 (1st Cir. 2004). "Generally the contract price is roughly equivalent to the value of the contractual performance . . . . An enormous disparity between price and value is a clue that something may be amiss." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 615 (7th Cir. 1998); see also *Joseph v. Wilson*, 372 N.E.2d 1110, 1113 (Ill. App. 1978). Or as the Illinois Appellate Court put it in the *NutraSweet* case, "where a contract is susceptible to one of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." 635 N.E.2d at 445.

Moreover, this is not a case in which the language of the contract is at war with the "reasonable" interpretation urged by the party whose position the language disfavors. The language as a whole favors Sutter, not Applied. Sutter's interpretation fits both the language of the contract and the contract's commercial setting better than Applied's does.

But this is not to say that the district judge's ruling was necessarily wrong. Some of the evidence that we have referred to in support of Sutter's interpretation was contested and the judge did not indicate which side he believed. Although the language of the contract and the economic setting favor Sutter, there may conceivably be enough contrary evidence, depending on the resolution of the conflicts in it, to support the judge's decision. However, because his findings do not trace a clear path from the evidence to the judgment, we are constrained to vacate the judgment and remand the case for further proceedings. *Ueland v. United States*, 291 F.3d 993, 994-95 (7th Cir. 2002); *Louis Vuitton, S.A. v. K-Econo Merchandise*, 813 F.2d 133, 134-35 (7th Cir. 1987); *Pearson v. Fair*, 808 F.2d 163, 165-66 and n. 2 (1st Cir. 1986)

(per curiam); *United States for Use of Belcon, Inc. v. Sherman Construction Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986). On remand the judge can if he wishes conduct a further evidentiary hearing. And since the total amount of money at stake in this case is modest by the standards of modern federal litigation, maybe this opinion will provide sufficient guidance to enable the parties to settle the case.

VACATED AND REMANDED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*